UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

ORTAVIOUS DEVON WILSON,
     Petitioner,

vs.                         Case No.:  3:20cv5848/LAC/EMT

SECRETARY DEP'T OF CORR.,
     Respondent.
_____/

## REPORT AND RECOMMENDATION

Petitioner Ortavious Devon Wilson (Wilson) filed a counseled amended petition for writ of habeas corpus under 28 U.S.C. § 2254 (ECF No. 5).  Respondent (the State) filed an answer and relevant portions of the state court record (ECF No. 9).  Wilson filed a reply (ECF No. 17).

The case was referred to the undersigned for the issuance of all preliminary orders and any recommendations to the district court regarding dispositive matters.  *See* N.D. Fla. Loc. R. 72.2(B); *see also* 28 U.S.C. § 636(b)(1)(B)–(C) and Fed. R. Civ. P. 72(b).  After careful consideration of the issues presented by the parties, it is the opinion of the undersigned that no evidentiary hearing is required for the disposition of this matter, Rule 8(a), Rules Governing Section 2254 Cases.  It is further the opinion of the undersigned that the pleadings and attachments before the court show that Wilson is not entitled to habeas relief.

## I.    RELEVANT BACKGROUND AND PROCEDURAL HISTORY

The relevant aspects of the procedural background of this case are established by the state court record (*see* ECF No. 9).  Wilson was charged in the Circuit Court in and for Escambia County, Florida, Case No. 2011-CF-110, with one count of second degree felony murder with a weapon/possession of a firearm (Count 1), one count of robbery with a firearm/possession of a firearm (Count 2), one count of possession of a firearm by a convicted felon, 10-20-Life (Count 3), and one count of possession of a controlled substance (Count 4) (ECF No. 9-1 at 63–64 (amended information)).[1]  Counts 3 and 4 were severed for trial (*see* ECF No. 9-1 at 89–91 (transcript of pre-trial hearing on motion to sever counts)).  On March 28–29, 2012, a jury trial was held on Counts 1 and 2, at the conclusion of which the jury found Wilson guilty of second degree felony murder as charged and robbery with a firearm as charged, with specific findings that Wilson actually possessed a firearm during commission of the robbery (ECF No. 9-4 at 45 through ECF No. 9-6 at 242 (transcript of jury trial); ECF No. 9-2 at 5 (verdict)).  On April 27, 2012, the court adjudicated Wilson guilty of Counts 1 and 2 and sentenced him as a prison releasee reoffender (PRR) to concurrent mandatory terms of natural life in prison, with pre-

---

[1] Citations to the state court record refer to the document numbers and page numbers assigned by the court's electronic filing system.

sentence credit of 156 days (ECF No. 9-2 at 9–31 (transcript of sentencing); ECF No. 9-2 at 40–47 (judgment and sentence)). Wilson filed a notice of appeal (ECF No. 9-2 at 49 (notice of appeal)).

On May 21, 2012, Wilson entered a written agreement with the State that he would enter a no contest plea to Counts 3 and 4, and his sentences on those Counts would run concurrently with any sentence he was then serving (ECF No. 9-2 at 36–39 (written plea agreement)). According to the circuit court's docket, the court accepted Wilson's plea, adjudicated him guilty of Counts 3 and 4, and sentenced him to concurrent terms of five years in prison on each Count, to run concurrently with the sentence on Count 1 (*see* ECF No. 9-1 at 10 (circuit court docket)). The judgment and sentence rendered the same day, May 21, 2012 (*see id.*).

On August 9, 2013, Wilson filed a motion to correct sentencing error, pursuant to Rule 3.800(b)(2) of the Florida Rules of Criminal Procedure (ECF No. 9-7 at 157–61). The trial court denied the motion (*id.* at 162–63).

The parties filed briefs in the Florida First District Court of Appeal (First DCA), Case No. 1D12-2443 (ECF No. 9-7 at 167 through ECF No. 9-8 at 25 (Wilson's initial brief); ECF No. 9-8 at 27–70 (State's answer brief); ECF No. 9-8 at 72–79 (Wilson's reply brief)). The First DCA affirmed the judgment per curiam without written opinion on January 23, 2014 (ECF No. 9-8 at 91 (opinion)). *Wilson*

*v. State*, 130 So. 3d 232 (Fla. 1st DCA 2014) (Table).  The mandate issued February

10, 2014 (ECF No. 9-8 at 84 (mandate)).  Wilson, through counsel, sought certiorari

review of one of his appellate issues in the United States Supreme Court, Case No.

13-1307 (ECF No. 9-8 at 86–102 (petition for writ of certiorari)).  The Supreme

Court denied the petition on June 23, 2014 (ECF No. 9-8 at 112 (opinion)).  *Wilson*

*v. Florida*, 573 U.S. 932 (2014).

On June 16, 2015, Wilson filed a counseled motion for post-conviction relief

in the state circuit court, pursuant to Rule 3.850 of the Florida Rules of Criminal

Procedure (ECF No. 9-11 at 4–16 (Rule 3.850 motion)).  Wilson subsequently filed

an amended Rule 3.850 (ECF No. 9-11 at 60–78).  The circuit court held an

evidentiary hearing on June 12, 2019 (ECF No. 9-11 at 129–98 (transcript of

evidentiary hearing)).  The circuit court denied the amended Rule 3.850 motion in

an order rendered on August 29, 2019 (ECF No. 9-11 at 199–209 (order)).  Wilson

appealed the decision to the First DCA, Case No. 1D19-3764 (ECF No. 9-14 at 95–

138 (Wilson's initial brief); ECF No. 9-14 at 140–78 (State's answer brief); ECF

No. 9-14 at 180–97 (Wilson's reply brief)).  The First DCA affirmed the circuit

court's decision on August 7, 2020 (ECF No. 9-14 at 199–204 (opinion)).  *Wilson v.*

*State*, 311 So. 3d 964 (Fla. 1st DCA 2020).  The mandate issued September 21, 2020

(ECF No. 9-14 at 206 (mandate)).

Wilson filed his federal habeas petition on September 25, 2020 (ECF No. 1).

## II.    STANDARD OF REVIEW

A federal court "shall not" grant a habeas corpus petition on any claim that was adjudicated on the merits in state court unless the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court."  28 U.S.C. § 2254(d)(1).  The United States Supreme Court explained the framework for § 2254 review in *Williams v. Taylor*, 529 U.S. 362 (2000).[2]  Justice O'Connor described the appropriate test:

> Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts.  Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

*Id.*, 529 U.S. at 412–13 (O'Connor, J., concurring).

Under the *Williams* framework, the federal court must first determine the "clearly established Federal law," namely, "the governing legal principle or

---

[2] Unless otherwise noted, references to *Williams* are to the majority holding, written by Justice Stevens for the Court (joined by Justices O'Connor, Kennedy, Souter, Ginsburg, and Breyer) in parts I, III, and IV of the opinion (529 U.S. at 367–75, 390–99); and Justice O'Connor for the Court (joined by Justices Rehnquist, Kennedy, Thomas, and—except as to the footnote—Scalia) in part II (529 U.S. at 403–13).  The opinion of Justice Stevens in Part II was joined by Justices Souter, Ginsburg, and Breyer.

principles set forth by the Supreme Court at the time the state court render[ed] its decision." *Lockyer v. Andrade*, 538 U.S. 63, 71–72 (2003).  After identifying the governing legal principle, the federal court determines whether the state court's adjudication is contrary to the clearly established Supreme Court case law.  The adjudication is "contrary" only if either the reasoning or the result contradicts the relevant Supreme Court cases.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) ("Avoiding th[e] pitfalls [of § 2254(d)(1)] does not require citation to our cases—indeed, it does not even require awareness of our cases, so long as neither the reasoning nor the result of the state-court decision contradicts them.").

If the "contrary to" clause is not satisfied, the federal court determines whether the state court "unreasonably applied" the governing legal principle set forth in the Supreme Court's cases.  The federal court defers to the state court's reasoning unless the state court's application of the legal principle was "objectively unreasonable" in light of the record before the state court.  *See Williams*, 529 U.S. at 409; *Holland v. Jackson*, 542 U.S. 649, 652 (2004).  "[E]ven a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

Section 2254(d) also allows habeas relief for a claim adjudicated on the merits in state court where that adjudication "resulted in a decision that was based on an

unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  The "unreasonable determination of the facts" standard is implicated only to the extent the validity of the state court's ultimate conclusion is premised on unreasonable fact finding.  *See Gill v. Mecusker*, 633 F.3d 1272, 1292 (11th Cir. 2011).  As with the "unreasonable application" clause, the federal court applies an objective test.  *See Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003) (holding that a state court decision based on a factual determination "will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceeding.").  "The question under AEDPA [the Antiterrorism and Effective Death Penalty Act of 1996] is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). AEDPA also requires federal courts to "presume the correctness of state courts' factual findings unless applicants rebut this presumption with 'clear and convincing evidence.'" *Landrigan*, 550 U.S. at 473–74 (quoting 28 U.S.C. § 2254(e)(1)).

The Supreme Court has often emphasized that a state prisoner's burden under § 2254(d) is "difficult to meet, . . .  because it was meant to be." *Richter*, 562 U.S. at 102.  The Court elaborated:

> As amended by AEDPA, § 2254(d) stops short of imposing a complete
> bar on federal-court relitigation of claims already rejected in state
> proceedings. *Cf. Felker v. Turpin*, 518 U.S. 651, 664, 116 S. Ct. 2333,
> 135 L. Ed. 2d 827 (1996) (discussing AEDPA's "modified res judicata
> rule" under § 2244). It preserves authority to issue the writ in cases
> where there is no possibility fairminded jurists could disagree that the
> state court's decision conflicts with this Court's precedents. It goes no
> further. Section 2254(d) reflects the view that habeas corpus is a "guard
> against extreme malfunctions in the state criminal justice systems," not
> a substitute for ordinary error correction through appeal. *Jackson v.
> Virginia*, 443 U.S. 307, 332, n.5, 99 S. Ct. 2781, 61 L. Ed. 2d 560
> (1979) (Stevens, J., concurring in judgment). As a condition for
> obtaining habeas corpus from a federal court, a state prisoner must
> show that the state court's ruling on the claim being presented in federal
> court was so lacking in justification that there was an error well
> understood and comprehended in existing law beyond any possibility
> for fairminded disagreement.

*Richter*, 562 U.S. at 102–03 (emphasis added).

A federal court may conduct an independent review of the merits of a petitioner's claim only if it first finds that the petitioner satisfied § 2254(d). *See Panetti v. Quarterman*, 551 U.S. 930, 954 (2007). Even then, the petitioner must show that he is in custody "in violation of the Constitution or laws and treaties of the United States," *see* 28 U.S.C. § 2254(a), and that the constitutional error resulted in "actual prejudice," meaning, the error "had a substantial and injurious effect or influence in determining the jury's verdict," *see Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (internal quotation marks and citation omitted).

III.    WILSON'S CLAIMS

A.    "**Ground 1:   It was error for the prosecutor to give an 'oral interpretation' of the inaudible portions of the tape recording of the conversation between Petitioner Wilson and Tavaras Grimsley. Alternatively, defense counsel rendered ineffective assistance of counsel by failing to timely object to the prosecutor giving an 'oral interpretation' of the inaudible portions of the tape recording.**"

Wilson asserts during trial, the State introduced an audio-video recording (hereinafter referred to as "in-car recording") of his conversation with Tavaras Grimsley that took place in the back of a patrol car after the robbery of Cornell Stallworth and the shooting of Eddie "Diggum" Peterson (ECF No. 5 at 7).  Prior to publishing the in-car recording to the jury, the court reporter asked if she should transcribe it as it was being published (*id.*).  Wilson asserts the trial court responded "[t]here's no way[; f]rom my recollection of the video." (*id.*).  Wilson asserts the prosecutor added:  "This is not something that can be transcribed.  They talk over each other.  There is radio dispatch, traffic going on, lower their voices at different times, they mutter . . . ." (*id.*).  Wilson asserts as a result, when the in-car recording was published the court reporter did not transcribe it (*id.*).

Wilson asserts during the prosecutor's closing argument, the prosecutor played portions of the in-car recording and then gave his "oral interpretation" of the inaudible portions (ECF No. 5 at 7–8).  Wilson asserts defense counsel failed to object to the prosecutor's interpretation (*id.*).  Wilson asserts defense counsel raised

the issue for the first time in a motion for new trial, arguing that the prosecutor's oral interpretations of the transcript during closing argument constituted an admission of evidence, and such admission was without foundation, cross-examination, or authentication (*id.* at 8–9).  The trial court denied the motion for new trial.

Wilson asserts he exhausted both sub-parts of Ground 1 (i.e., the claim of prosecutorial misconduct and ineffective assistance of counsel (IAC)) (ECF No. 5 at 9–15).  Wilson states he presented the claim of prosecutorial misconduct to the state court on direct appeal, and the IAC claim in his amended Rule 3.850 motion (*id.*).

The State argues an exhaustion defense with respect to the prosecutorial misconduct sub-claim of Ground 1 (*see* ECF No. 9 at 7–8, 24).  The State contends Wilson failed to assert any federal constitutional grounds in support of this claim in his initial brief on direct appeal and instead relied on state caselaw (*id.*).  Therefore, the prosecutorial misconduct claim is unexhausted and procedurally barred (*id.*).  The State alternatively argues that the First DCA's silent affirmance of the judgment should be considered an adjudication of the merits of the prosecutorial misconduct claim, and the First DCA's adjudication was not contrary to or an unreasonable application of clearly established federal law (*id.* at 24–25).

The State concedes Wilson exhausted the IAC sub-claim and contends Wilson has not satisfied § 2254(d) with respect to that claim (ECF No. 5 at 8–9, 25–27).

In reply, Wilson contends he satisfied the exhaustion requirement with respect to the prosecutorial misconduct sub-claim by specifically arguing in his initial brief that the prosecutor's conduct violated Wilson's constitutional right to a fair trial under the Fifth and Fourteenth Amendments (ECF No. 17 at 1 n.1).

## 1.    Prosecutorial Misconduct Sub-Claim

### a.    Exhaustion

The court will first address the State's exhaustion defense.  Before seeking federal habeas relief under § 2254, the petitioner must exhaust all available state court remedies for challenging his conviction, 28 U.S.C. § 2254(b)(1), thereby giving the State the "'opportunity to pass upon and correct' alleged violations of its prisoners' federal rights." *Duncan v. Henry*, 513 U.S. 364, 365 (1995) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971) (citation omitted)).  "To satisfy the exhaustion requirement, the petitioner must have fairly presented the substance of his federal claim to the state courts." *Picard*, 404 U.S. at 277–78.

A petitioner "fairly" presents the substance of his federal claim when he describes the claim "such that [the state courts] are permitted the 'opportunity to apply controlling legal principles to the facts bearing upon his constitutional claim.'" *Kelley v. Sec'y Dep't of Corr.*, 377 F.3d 1317, 1344 (11th Cir. 2004) (quoting *Picard*, 404 U.S. at 277); *French v. Warden, Wilcox State Prison*, 790 F.3d 1259, 1270–71

(11th Cir. 2015) (reaffirming that a habeas petitioner must "present his claims to the state court 'such that a reasonable reader would understand each claim's particular legal basis and specific factual foundation.'") (quoting *Kelley*, 377 F.3d at 1344–45). Courts apply "fair presentation" principles "with common sense and in light of the purpose underlying the exhaustion requirement—namely, giving the state courts 'a meaningful opportunity' to address the federal claim." *Lucas v. Sec'y, Dep't of Corr.*, 682 F.3d 1342, 1351 (11th Cir. 2012) (quoting *McNair v. Campbell*, 416 F.3d 1291, 1302 (11th Cir. 2005)).

"[A] petitioner with a claim that could arise under either state or federal law must clearly indicate to the state courts that he intends to bring a federal claim." *Preston v. Sec'y, Fla. Dep't of Corr.*, 785 F.3d 449, 458 (11th Cir. 2015). A petitioner does so, for example, by "including in his claim before the state appellate court the federal source of law on which he relies or a case deciding such a claim on federal grounds, or by simply labeling the claim 'federal.'" *Lucas*, 682 F.3d at 1351 (quoting *Baldwin v. Reese*, 541 U.S. 27, 32 (2004)); *see also Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998) (concluding that petitioner's federal claims were "fairly presented" when he provided enough information about the claims (and citations to Supreme Court cases) to notify the state court that the challenges were being made on both state and federal grounds).

As Issue 1 of Wilson's initial brief on direct appeal, appellate counsel argued that the prosecutor improperly gave an "oral interpretation" of the inaudible portions of the recording of Wilson and Grimsley's conversation in the patrol car (ECF No. 9-8 at 11–18).  In a footnote to the concluding sentence of his argument, appellate counsel argued that the prosecutor's improper closing argument violated Wilson's "constitutional right to a fair trial" and cited the Fifth and Fourteenth Amendments as well as a provision of the Florida Constitution (*id.* at 18 n.6).

In its answer brief, the State argued that the appellate court must review the issue for fundamental error, because Wilson's trial counsel failed to make a contemporaneous objection to the prosecutor's comments (ECF No. 9-8 at 47–48). The State argued that the prosecutor's comments on the recording were fair comments on the evidence, and any alleged error in the prosecutor's comments was not fundamental (*id.* at 49–57).

The First DCA affirmed the judgment and sentence in a one-word opinion, "Affirmed."

The undersigned concludes that even though Wilson did not present a federal claim in the trial court, his citation to provisions of the federal Constitution and reference to his constitutional right to a fair trial in his initial brief were arguably sufficient to satisfy the "fair presentation" requirement. *Cf. Preston*, 785 F.3d at 451

(holding that habeas petitioner did **not** exhaust his federal sufficiency-of-the-evidence claim where "neither his claim nor his briefs [on direct appeal] cited to any federal cases, let alone *Jackson v. Virginia* [the United States Supreme Court case setting for the federal standard applicable to such claims]; he did not mention the *Jackson* standard; **he did not cite to the Due Process Clause of the Fourteenth Amendment or any other federal constitutional provisions**; indeed, he did not even mention the word 'federal' or refer to federal law in any other way") (emphasis added).

The First DCA, which was the last state court rendering judgment on the federal fair trial claim, did not clearly and expressly state that its adjudication of the claim rested on a state procedural bar. Further, there is no reason to think the First DCA rejected Wilson's prosecutorial misconduct claim on grounds other than the merits. *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.").[3]  The court thus rejects the State's

---

[33] Even if the First DCA accepted the State's lack-of-preservation argument, the court was still permitted to review the claim for fundamental error. *See Rambaran v. Sec'y, Dep't of Corr.*, 821 F.3d 1325, 1328, n.3 (11th Cir. 2016) ("Florida's doctrine of fundamental error permits a court to review an issue that was not preserved in the trial court.") (citing *State v. Delva*, 575 So. 2d 643, 644–45 (Fla. 1991)).

exhaustion defense, concludes that the First DCA adjudicated the prosecutorial misconduct claim on the merits, and will address Wilson's argument that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable determination of fact.

### b.    Review Under § 2254(d)

#### i.    Clearly Established Federal Law

It is long established Supreme Court law that prosecutors must refrain from improper methods calculated to produce a wrongful conviction; they may strike hard blows but are not at liberty to strike foul ones. *See Berger v. United States*, 295 U.S. 78, 88 (1935). During closing arguments, a prosecutor may argue both facts in evidence and reasonable inferences from those facts. *See Tucker v. Kemp*, 762 F.2d 1496, 1506 (11th Cir. 1985) (citations omitted). But if the evidence is too insubstantial to support a reasonable inference, the prosecutor's comment will be deemed improper. *Id.* at 1507. Thus, prosecutors must observe the distinction between the permissible practice of arguing evidence and suggesting inferences which the jury may reasonably draw from it and the impermissible practice of arguing suggestions beyond the evidence. *See United States v. Simon*, 964 F.2d 1082, 1086 (11th Cir. 1992) (citation omitted). A prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions

he contends the jury should draw from the evidence.  *United States v. Johns*, 734 F.2d 657, 663 (11th Cir. 1984).

"[T]he limits of proper argument find their source in notions of fairness, the same source from which flows the right to due process of law." *Houston v. Estelle*, 569 F.2d 372, 380 (5th Cir. 1978).   "The relevant question is whether the prosecutor's comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, (1974)); *United States v. Young*, 470 U.S. 1, 10 (1985).  Thus, to establish prosecutorial misconduct, a two-prong test must be satisfied:   (1) the prosecutor's comments must have been improper; and (2) the comments must have rendered the trial fundamentally unfair. *See United States v. Eyster*, 948 F.2d 1196, 1206 (11th Cir. 1991) (citations omitted); *Brooks v. Kemp*, 762 F.2d 1383, 1400 (11th Cir. 1985) (en banc), *vacated on other grounds*, 478 U.S. 1016 (1986), *reinstated*, 809 F.2d 700 (11th Cir. 1987).

## ii.    Federal Review of State Court Decision

As discussed *supra*, Wilson presented his federal fair trial claim to the First DCA on direct appeal.  The First DCA affirmed Wilson's judgment and sentence without stating its reasons. *See Wilson*, 130 So. 3d at 232.  "[T]he summary nature of a state court's decision does not lessen the deference that it is due." *Wright v.*

*Moore*, 278 F.3d 1245, 1254 (11th Cir. 2002).  Where a state court denies relief without providing an explanation or its reasoning, the habeas petitioner must show that there was no reasonable basis for the state court's decision.  *See Richter*, 562 U.S. at 98.  The federal court must determine what arguments or theories supported or could have supported the state court's decision, and then ask whether it is possible that fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of the Supreme Court.  *See id.* at 102.[4]

The state court record demonstrates that during a recess in the trial proceedings, the court and counsel discussed admission of the in-car recording of Wilson's conversation with Mr. Grimsley and whether the court reporter should transcribe it during publication to the jury:

> MR. ROBINSON [the prosecutor]:  I think there's going to be a stipulation, Judge, that Defense will stipulate to the introduction of this video.

---

[4] The court is aware that where the relevant state court decision on the merits does not come accompanied with the state court's reasons, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale. *See Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).  The federal court should then presume that the unexplained decision adopted the same reasoning. *Id.*  Here, Wilson did not present a federal fair trial claim to the trial court in his motion for new trial (*see* ECF No. 9-2 at 4–6 (motion for new trial)).  Further, the trial court denied the motion for new trial without providing its reasons for doing so (*see* ECF No. 9-2 at 7 (order)).  Therefore, the federal court will determine whether Wilson has shown that there was no reasonable basis for the First DCA's decision. *See Richter*, 562 U.S. at 98.

MS. CASHWELL [defense counsel]:  Yes.

. . . .

THE COURT REPORTER:  Do I need to take this down?

THE COURT:  There's no way.  From my recollection of the video—

MS. CASHWELL:  That's because of the cheap speakers that the state attorney has, Your Honor.

THE COURT:  Well, the question was, she needs to know whether she needs to try to take down or transcribe what's on this, and because it's being admitted—

MS. CASHWELL:  I'm going to ask that she try—and let me tell you—the reason why I'm trying to do that is because the appellate attorneys, maybe they just pick on me, I don't know, but they're super picky, and that's why—if you can take anything down, if you can't, just unintelligible.

THE COURT:  Well, the problem is, again, whether or not what she's taking down is accurate—actually going to be accurate is another issue.  You could try.

MS. CASHWELL:  Does that cause, like—do you have to keep writing unintelligible five million times?

THE COURT REPORTER:  Yeah. I mean, if I pick up a "the", it'll be "the" and then unintelligible and then another word.  But it would be—

MS. CASHWELL:  So you don't have to sit there and type the whole time?  I mean, once you hear a word, you can type and then if you—and then it'd be unintelligible until you hear something else, right?

THE COURT REPORTER:  Yeah.  It's not going to make any sense, whatsoever, but if that's what you want, then I'll do it.

     MS. CASHWELL:  The only reason I say that is because then we know what the jury could hear because this is what is being broadcast in this courtroom right now.  And if this is what the court reporter can hear, then I think it's a fair assumption that, that's what the jury is hearing.

     THE COURT:  I think the jury has the chance to take it back and listen to it again and again and again.  So to suggest that, you know, because the court reporter couldn't take it down that, you know, the jury can't pick anything up is just wrong.

     MS. CASHWELL:  Lee [the prosecutor], do you know anything about the appellate courts as far as—

     MR. ROBINSON:  I don't.  But this is not something that can be transcribed.  They talk over each other.  There is radio dispatch, traffic going on, lower their voices at different times, they mutter—

     MS. CASHWELL:  Okay.  Then I'll withdraw it.  I'll withdraw it.  That's fine.  I understand.

(ECF No. 9-5 at 246–49).  The jury re-entered the courtroom, and the in-car recording was admitted into evidence and published to the jury without objection from defense counsel (*id.* at 250–51).

After the in-car recording was published, the trial proceedings concluded for the day.  The trial court and counsel discussed how counsel would "talk[] to the jury about what they heard" on the recording.

     THE COURT:  Okay.  Let me address a couple of quick things just so that I understand how tomorrow is going to go and what the plan is as far as both parties as far as talking to the jury about what they heard today on the video.

MS. CASHWELL:  You know, I was thinking about that same thing, Your Honor, while I was listening to it.  In fact, I made a note to research it.  Is because [sic] I think that the video is inaudible unless you sit there such that—you know, I think Mr. Robinson has done and I've done as well—and study it, and then we have interpreted what we think we hear.  And then I don't know if we should cloud the jurors' brain with that or not.  Does that make sense?

THE COURT:  I think there can be an argument made upon what you think is done.  The issue that I have or that I want to address before we even get out of the box here today, so that preparations can be made tomorrow, is that my guess is that either or both will want to put up in writing what you think it says.  And, again, that is just, kind of, a only [sic] in writing what each of you think it says and not somebody's individual transcript of it.  And I just need to know if there's going to be an issue with that at all before we go forward.

MS. CASHWELL:  I think it's wrong, so I'm not doing it.

THE COURT:  Well, are you objecting to the State doing it?

MS. CASHWELL:  Yeah, I am.  I can understand maybe, maybe oral argument.   But where it's played simultaneously with a transcript—with a translation, I think that—that invades the purview of the jury.  I think—that's audio and visual—

THE COURT:  Have you done the research on that in the past to where it's been done?  Because I'll say this—

MS. CASHWELL:  Didn't we have that permission with John Simon as the state attorney?

THE COURT:  A long time ago we did.  And this has been years and years ago.  And I—and there was no research provided to me, but in that trial, to move things along and because it didn't contain, you know, the length and the issues that are in this, I went ahead and said,

don't do the transcript, just do it orally.  But that doesn't mean that, that's my ruling as a matter of law for every case—

MS. CASHWELL:  But I haven't been provided any transcript by the State, except for a very short blurb.  Is there a transcript that the State intends on using?

THE COURT:  Here's what she is calling a transcript:  Anything you throw up there that has it in writing what you want them to interpret. . . .  And I don't know if you need to do that, if you want to do that, or if you're able to do it orally without throwing that up so that it doesn't become an issue.  I just wanted to address it now so that we didn't end up tomorrow, understanding that you—I think you may have done it in the previous trial without objection.  And that's the Grimsley trial [Wilson's co-defendant] without objection.  But knowing that Ms. Cashwell objected in the past to that type of thing, and we don't have time for people to go and work on redacting and doing this and that.  So I just need to know, number one, is it going to be an issue, or can you do it without putting what Ms. Cashwell is calling a transcript underneath those portions?

In other words, I don't think she would be objecting to you saying, all right, in the next section he says sick em [sic] dog and then you play it and they listen to that.  I don't think she has an objection to that.

MS. CASHWELL:  I would not object to that.

THE COURT:  I think her only objection is to them putting the writing underneath what you think that's being said.

MS. CASHWELL:  And the reason for that, Lee, is this:  I used to teach before I was an attorney.  And basically, when you have sick em [sic] I'll use sick em [sic] dog—when you have sick em [sic] dog underneath as the recording is being played, people are reading sick em [sic] dog, and so your brain intuitively and subconsciously interprets what noise is being heard as sick em [sic] dog.  Does that make sense?  Whereas, if you say this next part has sick em [sic] dog and then you

play it, the person—the jurors are able to concentrate just what they're hearing and decide, okay, yes, I'm hearing sick em [sic] dog or no, I'm not hearing sick em [sic] dog.  Does that make sense?  It's how humans learn.

        MR. ROBINSON:  Well, I understand what you're saying.  And I'll look at that tonight.  I don't like the idea of that [sic] I can say what I want but I can't type something.

        THE COURT:  Just understand this:  I have not made a ruling, and the ruling that I made years ago in a case it wasn't such that it was a major deal for him to redact it out.  And, you know, my whole deal is, is I want to resolve this issue in time for you to not—in other words, we don't have time for you to go back and do anything if I resolve it on the spot.  Because, again, I think it's something that we need to address now as to what we're going to do.  When I say now, I'm addressing it now so that you will know that there is a possibility that I might rule in her favor, and if that is the case, then you need to be prepared with one with [sic] the redacted and one with the other.  Fair enough?

        MS. CASHWELL:  Fair enough.

(ECF No. 9-5 at 255 through ECF No. 9-6 at 3).

        The next day, the prosecutor announced he was agreeable to the procedure of each party playing relevant portions of the in-car recording during closing arguments and verbally arguing to the jury what counsel heard, instead of showing the jury a written interpretation (ECF No. 9-6 at 17).  The court commented, "I think that's completely legitimate [closing] argument." (*id.* at 17).  Defense counsel agreed (*id.*).  The parties also agreed that the jury would be provided a computer during

deliberations to enable them to view and listen to the in-car recordings (*see* ECF No. 9-6 at 9).

The court and counsel also discussed a second audio/video recording, specifically, an in-car recording of Cornell Stallworth (the victim of the robbery who shot Eddie Peterson (the victim of the second degree felony murder)) in another patrol car speaking to Officer Folmar (ECF No. 9-6 at 3). Defense counsel wanted to admit the recording to show the jury that the version of events to which Stallworth testified at trial was different than what he described in the in-car recording (*id.* at 3–9). After much discussion, and review of the second in-car recording by the court and counsel, the court ruled that a portion of it was admissible (*id.* at 131–38).

Wilson chose to testify on his own behalf, and during his testimony, he told the jury what he said to Mr. Grimsley in the patrol car and why he said it:

> Q [by defense counsel]. [W]hen the officer put the two of you . . . inside a car together, okay.
>
> A [by Wilson]: Yes, ma'am.
>
> Q. What were you guys talking about?
>
> A. That we shouldn't got [sic] out the [sic] car. I don't know. I mean, because I never—I never witnessed no one to die [sic]. I never witnessed that in my life. And, I mean, it's like I was in shock really. And then it's a guy that I grew up with all my life so I—
>
> Q. Were you guys arguing back and forth about whether or not Eddie had passed or he was still alive?

A.  Yes.

Q.  Okay.  And the person that you were—that was in the car with you, was that Baba or Tavares Grimsley?

A.  Yes.

Q.  Now, did Grimsley say things to you like, Why did you let them shoot him?  Why did you—

MR. ROBINSON:  Judge, I'm going to object.  She's leading the witness.

THE DEFENDANT:  Yes, he did.

THE COURT:  All right.  I'm going to sustain the objection.  If you'll ask it in an open-ended manner, please.

MS. CASHWELL:  Okay.

Q (By Ms. Cashwell).  And how did you respond when he was—he asked you, you know, why did you let him shoot him?

A.  I mean, at first I was like just trying—just trying to gather my thoughts and just, you know, realize my cousin [Eddie Peterson] just got shot in the chest.  I was trying to gather [sic] that so I really wasn't hearing what he was saying.  But he just kept saying the same things over and over again, so I got upset at him.
. . . .
Q.  Did you tell Tavares [Grimsley] that you had hit the guy that was running away after shooting your friend in the head [sic]?

A.  Yes.

(ECF No. 9-6 at 118–20). Defense counsel then published the admitted portion of the Stallworth in-car video to the jury (*id.* at 142). The content was not transcribed by the court reporter (*id.*).

After the defense rested, the trial court instructed the jury that they would next hear closing arguments from the attorneys (ECF No. 9-6 at 146). The court instructed the jury, "Please remember that what the attorneys say is not evidence or your instruction on the law. . . . [T]heir arguments . . . are intended to aid you in understanding the case." (*id.*).

The prosecutor argued, in relevant part:

> Ladies and gentlemen, you've heard all the testimony that you're going to get. **You've got all the evidence that you're going to get, and you'll take that back with you.** And at that point you'll have everything you need. You're almost there. You've got all the witnesses and, like I said, all the testimony. In addition to that, you're going to get the law from the judge. That's going to come after the attorneys present our closing arguments. This is our opportunity to talk about what the evidence was **as we saw it. What matters is what you remember. Just as the judge said, this is the parties' efforts to explain the evidence and how the law applies to it. What we say is not evidence. What we say shouldn't be nothing [sic] new. If we say something happened, but a witness said this and you remember something differently from the stand, then you go with your memory. This is not us attempting to change what you heard.**
>
> . . . .
>
> Mr. Wilson is obviously upset that his cousin and friend [Eddie Peterson] got killed. Anybody would be. Both of them [Wilson and Grimsley] obviously in the back of that Tahoe are upset about what happened. Anybody would be. That doesn't make it a defense. That has nothing to with your verdict. And I would suggest that one reason

he's upset, and I think that—and you can see the video, you can see his reactions. That some of his reactions to Tavares Grimsley, to Baba, watch his face. **And you can take this video back with you again and watch it**, but watch him as he starts to get upset.  And I would submit he's getting upset in large part because if you listen to Grimsley, Grimsley is essentially saying you got him shot.   You let him get shot.  And there is some guilt.

. . . .

Now, in that video you'll see—**and you can watch it**—Mr. Wilson is—when you're looking at it on the right side, so he's in the rear seat behind the driver, Mr. Grimsley is on the other side.  He's the one that for the most part gets more animated at times.  He's the one who starts kicking on the side of the cruiser door at different points.  But this is the position they're in throughout.  Mr. Wilson is on the right as you look at it, and Grimsley is on the left.  There is a counter that runs on the bottom of the screen.  And Lord willing **it will be on the computer when you look at it back there.**  The time is about 7:43, they're back there and you'll hear Mr. Wilson—this part, too, **you listen to it and you make your determination about what you hear.  The Defense and I may differ about what we think we hear.  That's part of what this is, is to show it to you and you make the decision**.  But you're going to hear Mr. Wilson, the defendant, saying I popped him across the head and everything.

Grimsley then says, That man shot Diggum [Eddie Peterson], dog.

Wilson:  Check this out, when I popped him across the head, that's when Diggum was coming over.

(Whereupon, video was played and reported by the court reporter as heard)

(unintelligible conversation.)

Popped him the side of the head (unintelligible.)

(Unintelligible conversation.)

(Video stopped)

MR. ROBINSON:  When I popped him across the head, that's when Diggum was coming over there.  Does that sound like the defendant's version or does that sound like what Mr. Stallworth told you?  Now, Mr. Stallworth—and I recognize that the thing that he said, he told you that the second guy hit him in the head, Eddie Peterson, and that's the one that he shot.  **You listen to that video** and the defendant's own words he says five, 10 times that he's the one that hit him in the head.  So, yes, there is that discrepancy in what he [Stallworth] says, but you also remember that we stood over here when Mr. Stallworth was testifying and he was kind of in his door frame, which remember, he was facing towards the front, I believe he said kind of looking back.  And at the time he got hit he had turned his head, so was it possible that we didn't see the defendant actually hit him?  You make that decision.  But the defendant, what he is saying is in no way consistent with what he's telling you today.

. . . .

At 9:32.

(Whereupon, video was played, no intelligible portions to be reported)

MR. ROBINSON:  Wilson says, and it's hard, there's radio chatter over it and they're speaking low.  But listen, When I was at that car, man, I said put your hands up.  Don't reach for nothing, man.  When I was at that car I said put your hands up.  Don't reach for nothing.

That's not what he said today.  And remember, they don't know they're being recorded.  He said up here on the stand it wouldn't have mattered, I was upset, whatever.  He didn't know that it was being recorded.

At 11:35 Grimsley says I locked the door, Luke Duke [sic], talking to him.  I told that [racial epithet] don't get out.  Luke Duke got it, dog.  The defendant said, Check this out though, I hadn't said nothing

about getting out.     And then there's something that's hard to understand, but you'll hear him say on my own, man.

(Whereupon, video was played and reported by the court reporter as heard)

(Unintelligible conversation.)

(Unintelligible) on my own, man.

(Video stopped)

MR. ROBINSON:  At 14:45 Grimsley says that [racial epithet] shot y'all [sic], dog.

Wilson says, first thing I did was tap that man upside his head. First thing I did.

Grimsley says—and these are quoting—fuck y'all, dog.  **And there's some stuff that you can listen to, try to comprehend**.  But then he says, Y'all said y'all going go [sic] shoot that [racial epithet], man,

Wilson:  Check this out—

Grimsley:  Y'all should have left Diggum in the car.

Wilson:  We should have, but I'm telling you, man, I stepped up to him, drawed down [sic] on him, I slapped him across the head.

(Whereupon, video was played and reported by the court reporter as heard)

(Unintelligible conversation.)

Exactly.

(Unintelligible) dog.

Case No.:  3:20cv5848/LAC/EMT

(Unintelligible conversation)

(Video stopped)

MR. ROBINSON:  At 16:30 Grimsley is saying something and then you'll hear Wilson, check this out.  Check this out, man.  And that man was here, man, that man had his hands in the air.  I heard—

And Grimsley:  Folk shot Diggum, Luke Duke.

Wilson says, that's what I'm saying.  Shit.  I don't know—and they talk over each other.  And then Wilson says, That man was—listen, that man was stretched out at the bottom of the car.  I done beat him across the head and everything.  I don't know where that man fired that shot from, man.  And you hear Grimsley muttering and making loud noises. Wilson said 'cause he got his hands in the air.  You done bapped [sic] him across the head and everything, man.  A few minutes later, again, that man had his hands in the air.

(Whereupon, video was played and reported by the court reporter as heard)

(Unintelligible) hands in the air.

(Unintelligible) that's what I'm saying.  Shit.  I don't know.

(Unintelligible conversation.)

(Unintelligible) hands in the air (unintelligible) across the head (unintelligible.)

(Video stopped)

MR. ROBINSON:  Does that sound like somebody who was out in the street when this happened?  That he was talking in this kind of detail, about him hitting him on the [sic].  Bapping [sic] him on the head.  That he's laid out across the bottom of the car.  And I would

expect that the explanation would be that he was talking about I beeped [sic] him on the head when I came in.  But listen to the rest of it.  That's not what they're talking about.

At 17:33 Grimsley said he shouldn't have gotten out, dog.

Wilson:  Exactly.

And it kind of stops.  Who—did I ask anybody to get out?

Grimsley:  I told Diggum don't get out Luke Duke.

Defendant:  I'm saying, did I ask anybody to get out?

Grimsley:  No, I told him not to get out of the car.

Defendant:  I said I'm fixing to go holler at those folks, man.

Grimsley:  I told him don't get out.  Said Diggum, come on, Luke Duke, has got those [racial epithet], man.

And then Wilson said, And I had them.

Grimsley said, That [racial epithet] had a gun, dog.

And then Wilson, no—I don't know where he grabbed it from. He ain't have [sic] it.

He's telling you he wasn't even there, he was somewhere else. And now he's questioning I don't know where he got the gun from. Does that sound like the story he told you or does that sound more like what Mr. Stallworth told you happened?

(Whereupon, video was played, no intelligible portions to be reported)

MR. ROBINSON:  Now, I'm sure he explained it, Well, I was going to go talk to them folks.  That's what I was talking about.  And I

told him to stay in the car. Then I went and talked to my baby mama and that's what I meant. Listen to that. That's what he testified to. Is that what he's talking about in that video? I had 'em. Had what? He's just going to talk to these other—to this girl. You don't hear that. They don't know where the gun came from. They're still trying to figure out how did this guy get a gun on us. We didn't see it. And he told you how. He hid it. And when they knocked him in the car, he hid it up here until he got out. Until he was pulled out and still standing, chest to chest, basically, with Eddie Peterson. They never saw the gun until he fired it. That's what's confusing these guys. They don't understand how that happened. Not that they don't know what happened on the scene. They don't talk about that, there's no what happened? I wasn't here. What happened? The question is where did that gun from? I didn't see that.

Next is at 23:44. Wilson says, Man, check this out. That [racial epithet] say it's all in the door. I grabbed that shit. And that's it. He's telling you what Stallworth told you, which is I said it's in the door.

(Whereupon, video was played and reported by the court reporter as heard)

That [racial epithet] said it's all in the door.

(Unintelligible.)

(Video stopped)

MR. ROBINSON: What else could he be talking about? He was never at the car. Remember, he told you he wasn't there. So who is telling him something in the door? What's in the door? Does that make any sense based on what he told you? No.

At 27:37 Grimsley says I thought y'all shot him. And then Wilson says, Shit, that's what I thought happened. Hey, hold up now, dog, and he starts to lean over. He's getting a little more quiet. He said, think about this, if them crackers find that gun—he's talking about his gun that he tried to throw not very well up under the Tahoe—o[r] the

Blazer, I'm sorry. Why is he worried about his gun in the middle of all this if what's got him stressed out is simply his cousin? It's the big picture. He's freaking out because he was robbing this guy and this guy shot his cousin, his accomplice. And now in addition to losing him and getting charged with robbery and a murder, he's got a gun that he shouldn't be having. He's throwing that up under there and now he's worried about them finding that too.

(Whereupon, video was played and reported by the court reporter as heard)

(Unintelligible) dog.

(Unintelligible.)

Hey, hold up (unintelligible.)

(Video stopped)

MR. ROBINSON: At 30:16 Wilson said when I bapped [sic] them folk across the head, man, they supposed to have their hands up, man. I was supposed to just grab that money out the door.

(Whereupon, video was played and reported by the court reporter as heard)

(Unintelligible) grab that money out the door.

(Video stopped)

MR. ROBINSON: What money did Mr. Stallworth have as he's running by with his hands up and getting tapped in the head as he's running by? That's his story. It didn't happen. That's exactly what Stallworth told you, the money's in the door. I told him the money is in the door, I got hit in the head. The money was gone. That's exactly what he's telling you. He doesn't know he's telling you at the time, but that's exactly what Wilson is telling you he did.

At 32:57. Wilson: Check this out. Talks about a [racial epithet] with his hands up in the air. Man is supposed to get that shit out the door. I grabbed that shit out the door, man. Then Diggum ran up.

(Whereupon, video was played and reported by the court reporter as heard)

(Unintelligible conversation.)

I grabbed that shit out the door, man. Diggum ran up.

(Video stopped).

MR. ROBINSON: And then at 47:54 he says, I'm saying that the [racial epithet] throws his hands up in the air and, say—and it gets—**you'll have to listen**—but he's quoting, if somebody throws his hands up in the air and says, I swear to God, it's all in the door and then he mutters some—and then he stops for a minute and then he ends it, might have been another [racial epithet] with him or something, man. He's still trying to figure out how Eddie Peterson got shot. Not because he was on Mobile Highway, but because he was right there and still can't figure out how this guy got a gun after I bapped [sic] him in the head and he was laid out across the floor, how did he get a gun and shoot him? He still can't figure it out, so now he's thinking maybe there was another person involved. Not because he's out in the street talking to his baby mama, but because he's right there robbing Cornell Stallworth.

(Whereupon, video was played, no intelligible portions to be reported)

MR. ROBINSON: The evidence points to one reasonable conclusion, and that's the State's burden beyond a reasonable doubt. And the credible evidence is that the Defendant got out to rob Mr. Stallworth. He did rob Mr. Stallworth. Mr. Stallworth was hit in the head. Mr. Stallworth picked up his gun while the Defendant and Eddie Peterson who had joined him were both holding guns on him to rob him. The Defendant got the money out of the door just like he said he did more than once. It's in his pocket. And unfortunately for them,

Eddie Peterson got shot.  Fortunately for Mr. Stallworth—it wasn't like Grimsley was talking about, and I didn't even pull most of his stuff. You can listen to his quotes on there as well, where he uses very clearly, y'all said you were going to shoot him.  Kill him.  Burn him.  It's a tragedy.  But it's their fault.  And if they had their way, from what's said in that video, it would be Mr. Stallworth laying [sic] on the ground because that's what they talk about.  And that's what the credible evidence supports.

(ECF No. 9-6 at 147, 156–59, 162–71) (emphases added).

Defense counsel began her closing argument by arguing that the prosecutor's interpretation of what was said in the in-car recording was wrong:

> MS. CASHWELL:  Thank you,  Your Honor.
>
> Good afternoon, ladies and gentlemen.  You have now heard all of the evidence.  You've heard all the testimony from the different witnesses.  You've got a plethora of crime scene photos, and you've got two very important in-car videos.  **You just heard the State's interpretation of the video.  And what I would invite you to do is— he took out snippets out of context.**  And I don't know if you guys have ever played the telephone game.  But the telephone game is where one person says I've got a turtle underneath my desk.  And by the time that same statement has made its way around and everybody has interpreted what they've heard, when it gets to the last person it sounds something like, you know, I've got a Filipino for an aunt.  **So what I would invite you to do is take that video back, this in-car video, and listen to it yourself, the entire thing in context.**  And when you hear the word "door," listen to which door he's talking about.  **So listen to the entire video and listen to it multiple times and make your own interpretation about what it is, because the State's interpretation, I can tell you, the Defense disagrees with their interpretation of what is being said**.

(ECF No. 9-6 at 171–72) (emphases added).

Defense counsel continued her argument, arguing not only what Wilson said in the in-car recording, but what Cornell Stallworth (the victim of the robbery) said in the second in-car recording:

> Mr. Stallworth has actually made two statements to you about what happened.  The first statement that he made under oath was that he got—he was standing there in the door of his car and his—his head was slightly turned.  And he said the dark skinned man, Diggum, Eddie Peterson, swung and hit him upside the head.  And he swore up and down it was Eddie Peterson.  It was Eddie Peterson, he hit me upside the head.  And that then he collapsed into the car and then for whatever reason two men that were allegedly armed with guns that are hovering over him while he's laying [sic] there don't notice that he's opening the glove compartment.  That he's pulling out a holster.  That he's taking the gun out of the holster.  I don't know if he had a chamber or shot.  That then he gets out of the car and turns around, he's able to make contact, shoot him in the chest and escape unscathed.  That was story number one.  Story number two, which you saw on the in-car video with Folmar, was where Cornell Stallworth said, Man, get this.  I went in the car like I was trying to get something out of my glove compartment, like, money and stuff but instead I got the gun.  Nothing about getting hit on the head and falling into the car.  He complains about his head, but nothing about he got hit on the head and then fell into the car.
>
> And why would Cornell Stallworth not be truthful about who hit him on the head?  Why would he say it was Eddie Peterson if it was Mr. Wilson?  And the reason is, is because he knows that he got hit on the head as he was running from shooting Eddie Peterson.  He knows that he saw Mr. Wilson coming to Eddie's rescue and he had the gun, and he ran and put his hands up and said, uh-uh, you know, like I didn't do anything, and that's what you hear on the in-car video, is when you hear Ortavious Wilson saying I didn't see a gun.  I didn't see him have a gun because he saw Stallworth running towards him from the scene of the crime and throw his hands up like, oh, no, I don't have a gun.  And you can see that same type of behavior by Cornell Stallworth on

the in-car video by Folmar, which I'm going to show you in a second, where you see him sliding into the Blue Bar.  And you'll see him, he's in a white shirt and before Tatum's car moves you see him kind of hovering close to the back of the cars, kind of looking around, you know, kind of looking at the lay of the land.  And but for Tatum noticing something had happened across the street at the Circle K and getting ready to respond to it, the Defense truly believes that Stallworth would have tried to edge his way into the Blue Bar and get mixed up in the crowd so he'd have an alibi.

. . . .

I want to show you again Cornell Stallworth.  And it's right—

Your Honor, if I could turn the light—what you're going to see, ladies and gentlemen, is this looking out the front windshield of Deputy Folmar's car.  And if you look right out the windshield of Deputy Folmar's car you see Deputy Tatum's car.  I remember he said he was parked perpendicular to Folmar's car.  What you're going to see on the right hand top of the screen is after a black it looks like a black pickup truck comes in.  You're going to see a man in a white shirt.  He's not running in there.  And he's not making a beeline to the police officers.  You see him kind of slowing down to a trot and kind of gauging the situation.  And, he, you will see that he doesn't approach Tatum's car until he sees that Tatum has keyed in on what's occurring across the street.

(Whereupon, video was played, no intelligible portions to be reported)

MS. CASHWELL:  Now you see them strolling through.  Now Tatum is getting his car geared up.  And this is when he approaches him.  Now, he walks over to Folmar.

(Video stopped)

MS. CASHWELL:  You're going to see him get into Folmar's car.  And listen to what he says about what happens, about why he's going into the car to his glove box, because now he's had time to think about his robbery story.  He just can't remember the details.

(Whereupon, video was played and reported as heard by court reporter)

(Unintelligible conversation)

They in a black Magnum, dog.  They in a black Magnum.

(Unintelligible radio traffic)

Hey, Hold up, man.

They in a black Magnum, man.

Huh?

They in a black Magnum.  All black Magnum.

The ones that tried to rob you?

It's two of (unintelligible) the car.  It's a black Magnum. (Unintelligible) the driver jumped out.  (Unintelligible) [racial epithet] jumped out the (unintelligible) [racial epithet] jump out the passenger back.  Shit.  They in an all black Magnum.  (Unintelligible)  I got a knot on my head right now.  Fuck.  Man, that shit hurt.

(Unintelligible.)

Kishma?

Kishma (unintelligible) tell him to come here.

(Unintelligible) relax (unintelligible.)

(Video stopped)

MS. CASHWELL:  And you remember the testimony where he was talking about Kishma and Keanthony as ones that have had issues

with Eddie Peterson and with Ortavious Wilson in the past, but that wasn't allegedly who was with them. That's what he said. He said it was some boy named Keith, he just didn't know the last name,

(Whereupon, video was played and reported by the court reporter as heard)

I got a knot on my head, man. Hey (unintelligible.) Hey, tell him I seen a two-door Mercedes Benz pull of [sic] in front before (unintelligible) [racial epithet] in the Magnum, dog.

(Unintelligible) go over there and start getting information, all right? You all right?

Yeah, I got a knot on my head. [Racial epithet] hit me in the head with a pistol. (Unintelligible) I was changing my pants, right, and see all my money in the side of my door, so I'm going in there (unintelligible) like a revolver out his pocket (unintelligible.) So I was like, damn, what's up? He was like (unintelligible.) I was like (unintelligible) I don't even know you, fool. So what I did, I leaned in the car like I was going to get something (unintelligible) give me everything in your pocket (unintelligible.)

All right. Give me one second, all right?

(Video stopped)

MS. CASHWELL: So you heard him right there where he said I went and—went into my glove compartment like I was trying to get something and instead I got my gun out of my holster. Completely different than what he said today.

And here's something else to think about, he said that his good buddy Keith, the person that he was allegedly with that day, was not Keanthony or Kishma but Keith was right there by the white building, so after this alleged robbery he goes running, right, over there by the white building, talks with Keith.

. . . .

So if you look at the State's case—the State has three things that they're relying heavily upon. Cornell Stallworth's statement, an in-car video and the fact that they have guns. The first one, Cornell Stallworth's statement, inconsistent with his own statement about what happened. Inconsistent with the witnesses other statements, independent witnesses. Inconsistent with the forensic evidence. And then anything that could prove or disprove whether he's telling the truth, for example, let's get some DNA or fingerprints off the money, hasn't been done by the State. Number two, guns. All three were carrying guns. So what? It's your second, what, your right in the constitution to bear arms. Everybody is bearing arms. Fine. But only one person of those three fired a shot and killed somebody, and that was Cornell Stallworth. If we're talking about who has something to gain here, it's Cornell Stallworth. No robbery means he's a murderer. And number three, the in-car video, **I invite you to listen to that in-car video over and over again. Not like the telephone game. Not out of context, but listen to it in its entirety.**

I'm going to go through some of the in-car video just real quickly and then I'll come back to this. **In the in-car video there's three rules: Number one, you guys are the jury. Number two, you're the fact finders. And number three, it's your interpretation. Not my interpretation. Not the state attorney's interpretation of what's on that video and what's on that audio. I invite you to listen to it** and I think what you're going to hear when you listen to it is you hear two men upset in tears. One of them, I think, is falling apart and that's Grimsley. He's the one kicking the door and everything, because their good friend Eddie Peterson who was coming back from working in Mobile, who had landed a great job, they're all in their late twenties, early thirties and they were together again, all three cousins. And now he was shot and they didn't know at that point if he was dead or not. So you'll hear them saying constantly, Diggum is dead. No, he's not dead. Yes, he's dead. The police said he's okay. The police wouldn't lie. They would tell us if he was not okay, if he was dead. And you'll hear that back and forth where they're going on and on for almost the entire duration, almost torturing themselves with whether Diggum or Eddie Peterson has passed or not, if he's okay. The second thing that you're going to hear is Tavares Grimsley getting mad at Mr. Wilson

and saying, You got out of the car. You got out of car. Because when he got out of the car to go talk to Takevia, the car stopped moving. When the car stopped moving Eddie Peterson got out of the car. And when Eddie Peterson got out of the car, there was Keanthony and there was Cornell Stallworth, and there was bad blood. And the third thing that you'll hear is you'll hear Mr. Grimsley saying, Why didn't you shoot him? Why didn't you shoot him? Because he wanted some sort of revenge. This Cornell Stallworth just killed their best friend, one of their close cousins. They wanted some kind of revenge. Why didn't you kill him? And you will hear Mr. Wilson say, no. No. And then you hear Mr. Wilson say but I hit him on the head. You know, I did do something. I tried to stop him. I hit him on the head. And then you'll hear them confused about how he got shot. Because you'll hear Mr. Wilson saying I didn't see a gun. Because when he was coming at me he threw his hands up. I didn't see any gun. And Grimsley who is sitting in the car, he didn't see the shooting. So neither one of these guys knows how it was that Eddie Peterson got shot. All they know is that their friend was shot and is possibly dying. And if you want to find—the proof is in the pudding. Sometimes actions speak louder than words, right, because we can say a ton of things, but your actions are what you can really judge somebody by. And here's the actions, Cornell Stallworth's easing into the Blue Bar parking lot, hovering around the cars, looking around. I think trying to decide if he could make it into the Blue Bar and have an alibi versus Mr. Wilson and Mr. Grimsley staying put right there with their friend. Not getting rid of a gun. Not trying to wipe anything down. Not doing anything but saying to the police officer our friend has been shot. They have no reason to run because they didn't do anything wrong. And you'll hear them throughout the tape, they're confused.

(ECF No. 9-6 at 178–80, 185–89, 193–96) (emphases added).

In the prosecutor's final argument, he repeated his suggestions regarding the inferences the jury should draw from the in-car recording the other evidence

presented (ECF No. 9-6 at 199–211).  The prosecutor again urged the jury to listen to the recording in its entirety:

> **Do listen to it [the recording].  Listen closely to it.  Listen to the whole thing.**
>
> **. . . .**
>
>        **The bottom line, if you need to listen to that video again, I would certainly encourage you to.  You'll be able to take it back with you.  I believe we'll have a computer set up, you can listen to it all you want.  Your interpretation, that's one thing that we can agree on.  It is your interpretation of all of this that matters.  Not mine.  Not the Defense.  You listen to it.  You use your ears, your common sense and you listen to it.**

 (ECF No. 9-6 at 200, 209) (emphases added).

Considering the prosecutor's comments in the context of the entire trial, the First DCA's rejection of Wilson's federal fair trial claim could have been based upon the theory that the prosecutor's comments were not improper, and/or the comments did not deprive Wilson of a fundamentally fair trial.[5]  Wilson testified regarding what he said to Grimsley in the patrol car.  The trial court instructed the jury that what the prosecutor and defense counsel said during closing arguments was not evidence.  During closing arguments, the prosecutor suggested to the jury inferences they could draw from the recording.  Defense counsel argued that the prosecutor's interpretation was incorrect and did not make sense, and she offered her

---

[5] Even though the undersigned included specific portions of the trial transcript in this Report and Recommendation, the court considered the transcript in it entirety in analyzing Ground 1.

interpretation of the statements made by Wilson and Grimsley. Defense counsel also argued to the jury her interpretation of Mr. Stallworth's actions and statements in the second in-car video. And both attorneys reminded the jury numerous times that it was their job to view the in-car recordings and determine what was said. The jury heard the recordings during trial, and the recordings were available to them during deliberations, so they could determine what was said by Wilson, Mr. Grimsley, and Mr. Stallworth.

The First DCA could have concluded that the prosecutor's comments on the recording were not improper. *See, e.g., United States v. Braswell*, 704 F. App'x 528, 538–39 (6th Cir. 2017) (unpublished but cited as persuasive authority) (holding that the government did not commit prosecutorial misconduct when it stated, during closing arguments, its interpretation of defendant's statements in audio tapes; government's statements reasonably could be characterized as making inferences from the admitted evidence; the government made the allegedly improper statements only during its closing argument and not before the jury had the opportunity to hear the tapes; and the jury had the opportunity to listen to the tapes repeatedly during their deliberations).

The First DCA could have alternatively or additionally concluded that the prosecutor's comments did not deprive Wilson of a fundamentally fair trial.

The undersigned concludes that a fairminded jurist could agree with either or both of these conclusions. Because there was a reasonable basis for the state court's rejection of Wilson's prosecutorial misconduct claim, Wilson is not entitled to federal habeas relief on this sub-claim of Ground 1. *See, e.g.*, *Robinson v. Tucker*, No. 3:10cv101/RV/MD, 2012 WL 1192140, at *13 (N.D. Fla. Mar. 2, 2012) (denying petitioner's claim that prosecutor improperly commented, during opening statement and closing argument, as to contents of audio recording:  "First, Mr. Robinson's trial counsel did not object to the alleged improper comments, which is not surprising because once the tape was in evidence the prosecutor could make reference to it; so could Mr. Robinson's counsel.  Second, Mr. Robinson's appellate counsel cited cases to the First DCA that detailed blatant prosecutorial conduct, which necessitated a new trial.  A review of the trial transcript demonstrates that no such actionable conduct by the prosecutor exists in order to support such an outcome here.  This supports the First DCA's affirming the conviction.  Lastly, the jury had the opportunity to listen to the tape recording several times during the trial and during their deliberations in order to make up its mind as to its content, which negates any prejudice to Mr. Robinson."), *Report and Recommendation Adopted* 2012 WL 1192130 (N.D. Fla. Apr. 9, 2012), *certificate of appealability denied* (11th Cir. 12-12764) (Oct. 11, 2012).

Wilson has not demonstrated that the First DCA unreasonably applied Supreme Court precedent in rejecting his challenge to the prosecutor's closing argument. Therefore, Wilson is not entitled to federal habeas relief on this sub-claim of Ground One.

### 2.    IAC Claim

Wilson asserts a related IAC claim, that is, defense counsel was ineffective for failing to make contemporaneous objections to the comments made by the prosecutor during closing arguments that are discussed *supra* (ECF No. 5 at 7–15). Wilson contends defense counsel had a state law basis to object under *Wilson v. State*, 680 So. 2d 592 (Fla. 3d DCA 1996) (*id.* at 10–12). Wilson contends he was prejudiced by counsel's failure to object, because the prosecutor's "oral interpretation" of the in-car recording prejudicially influenced the jury regarding its consideration of "the biggest piece of evidence in the case" (*id.* at 12). Wilson asserts he presented this IAC claim in his amended Rule 3.850 motion and in the post-conviction appeal (*id.* at 12–15). He contends "the state courts' rulings regarding this claim were contrary to and an unreasonable application of Petitioner Wilson's constitutional rights" (*id.* at 15). He additionally contends the state courts' rulings were based on an unreasonable determination of the facts in light of the evidence contained in the state court record (*id.*).

The State asserts that "it appears" Wilson exhausted the IAC sub-claim of Ground 1 (ECF No. 9 at 8–9).  The state contends the claim was adjudicated on the merits by the state court, and Wilson had not satisfied the standard for habeas relief under § 2254(d) (*id.* at 26–27).

### a.    Clearly Established Federal Law

The standard for evaluating claims of ineffective assistance of counsel is set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).  To obtain relief under *Strickland*, the petitioner must show (1) deficient performance by counsel, and (2) a reasonable probability that, but for counsel's deficient performance, the result of the proceeding would have been different.  *Id.* at 687–88.  If the petitioner fails to make a showing as to either performance or prejudice, he is not entitled to relief.  *Id.* at 697.

The focus of inquiry under the performance prong of *Strickland* is whether counsel's assistance was "reasonable considering all the circumstances," and reasonableness is measured "under prevailing professional norms."  *Strickland*, 466 U.S. at 688.  "The petitioner's burden to prove, by a preponderance of the evidence, that counsel's performance was unreasonable is a heavy one."  *Jones v. Campbell*, 436 F.3d 1285, 1293 (11th Cir. 2006) (citing *Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc)).  "Even if many reasonable lawyers would

not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." *Rogers v. Zant*, 13 F.3d 384, 386 (11th Cir. 1994).

The Supreme Court instructed that in reviewing claims of ineffective assistance of counsel the court must be mindful of the following:

> Judicial scrutiny of counsel's performance must be highly deferential.  It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.  A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.  Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."  There are countless ways to provide effective assistance in any given case.  Even the best criminal defense attorneys would not defend a particular client in the same way.

*Strickland*, 466 U.S. at 689 (citations omitted).

As to the prejudice prong of the *Strickland* standard, the petitioner's burden of demonstrating prejudice is high.  *See Wellington v. Moore*, 314 F.3d 1256, 1260 (11th Cir. 2002).  To establish prejudice, the petitioner must show "that every fair-

minded jurist would conclude 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Jones v. GDCP Warden*, 753 F.3d 1171, 1184 (11th Cir. 2014) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome," not that counsel's conduct more likely than not altered the outcome of the proceeding. *Id.* (citation omitted). The petitioner must show that the likelihood of a different result is substantial, not just conceivable. *Williamson v. Fla. Dep't of Corr.*, 805 F.3d 1009, 1016 (11th Cir. 2015) (citing *Richter*, 562 U.S. at 112). "When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Strickland*, 466 U.S. at 695.

Finally, when a district court considers a habeas petition, the state court's findings of historical facts in the course of evaluating an ineffectiveness claim are subject to the presumption of correctness, while the performance and prejudice components are mixed questions of law and fact. *Strickland*, 466 U.S. at 698; *Collier v. Turpin*, 177 F.3d 1184, 1197 (11th Cir. 1999). "Surmounting *Strickland's* high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). "Establishing that a state court's application of *Strickland* was unreasonable under

§ 2254(d) is all the more difficult." *Richter*, 131 S. Ct. at 788.  As the *Richter* Court explained:

> The standards created by *Strickland* and § 2254(d) are both "highly deferential," and when the two apply in tandem, review is "doubly" so.  The *Strickland* standard is a general one, so the range of reasonable applications is substantial.  Federal habeas courts must guard against the danger of equating unreasonableness under *Strickland* with unreasonableness under § 2254(d).  When § 2254(d) applies, the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard.

*Id.* (citations omitted).

### b.    Federal Review of State Court Decision

Wilson presented this IAC claim as Ground 1 of his amended Rule 3.850 motion (ECF No. 9-11 at 64–69).  He argued that defense counsel had a meritorious basis to object to the prosecutor's comments under *Wilson v. State*, 680 So. 2d 592 (Fla. 3d DCA 1996), and counsel's failure to do so constituted deficient performance (*id.*).  Wilson argued that absent counsel's failure to object, the result of trial would have been different "and/or counsel's ineffectiveness affected the fairness and reliability of the proceeding, thereby undermining any confidence in the outcome" (*id.* at 69).

The state circuit court held an evidentiary hearing, and the transcript of that hearing is part of the state court record (*id.* at 129–98).  Following the hearing, the

circuit court issued a written decision citing the *Strickland* standard as the applicable

legal standard, denying Wilson's post-conviction claims, and setting forth reasons

underlying its decision (*id.* at 199–209).    Specifically with respect to counsel's

failure to object to the prosecutor's comments during closing arguments, the court

made the following factual findings and legal conclusions:

> An evidentiary hearing was held as to this claim.    Patrece
> Cashwell, Defendant's trial counsel, testified she did not realize until
> after the guilty verdict that she should have objected to any oral
> interpretation of the inaudible portions of the recording.    Ms. Cashwell
> promptly filed a motion for new trial on the basis of the *Wilson* case
> that was denied by the trial court.    Ms. Cashwell testified that during
> closing arguments the prosecutor did not use a PowerPoint to show the
> jury his interpretation of the recording.    However, she remembered the
> prosecutor "definitely" using a PowerPoint for this purpose during trial
> and she thought "maybe" the PowerPoint had been introduced into
> evidence through a police officer.    Ms. Cashwell confirmed that the jury
> was informed that the attorneys' argument was not evidence in the case.
> Ms. Cashwell further testified that at the time of trial, she and the
> prosecutor had a strategic reason for arguing to the jury each of their
> own individual interpretations of the recording.    After reviewing the
> *Wilson* case, she concluded it was inappropriate for either she or the
> prosecutor to have given an interpretation.    Ms. Cashwell testified that
> after the guilty verdict she polled random persons from the audience
> and the consensus was that the in-car video was the evidence that led to
> the conviction.    Consequently, Ms. Cashwell felt that if she had
> objected to the recording being interpreted, it would have made a
> difference in the jury's verdict.
>
> Contrary to Ms. Cashwell's testimony, the record does not
> indicate that the prosecutor ever used PowerPoint during the
> evidentiary portion of the trial to show the jury a written interpretation
> of the in-car video.    The recording was not introduced through an
> officer but by stipulation.    While it was discussed that a written

interpretation might have been permitted in Mr. Grimsley's trial without objection, Ms. Cashwell indicated she would be objecting in this case to any written interpretation of the in-car video. Additionally, the Court has reviewed the CourtSmart recording of the trial[FN 10] and it does not show that the State used a PowerPoint in coordination with publishing this in-car video to the jury. Ms. Cashwell's testimony regarding a written interpretation being provided to the jury as evidence is therefore refuted by the record and not credible.

> [FN 10:  This was entered into evidence at the hearing as State's Exhibit #1.]

Defendant has failed to show that counsel was deficient in not objecting to the State's oral interpretation of the recording used during closing arguments. Ms. Cashwell credibly testified that the decision to permit oral interpretations to the jury of the in-car video was strategic. Additionally, the Wilson case is distinguishable from the case at bar. In Wilson, the victim testified as to her interpretation of the inaudible sections of the defendant's telephone message.  The Court held that neither a written nor oral interpretation of a partially inaudible recording is admissible unless the interpretation is authenticated by a person having personal knowledge of the contents of the recording or by an expert witness skilled in interpreting inaudible recordings. Wilson, 680 So. 2d at 594.  The Wilson case applies when an interpretation of a recording is entered into evidence.  In this case, neither the prosecutor's or [sic] defense counsel's interpretation of the recording was evidence in this case.  Case law implies that an interpretation of a recording that is not evidence and is used to aid the jury in understanding the contents of a recording is permissible.  See Hunt v. State, 746 So. 2d 559, 561–62 (Fla. 1st DCA 1999).  As such, Defendant has failed to show that counsel was deficient in failing to make an objection to the prosecutor's oral interpretation of the recording.

Defendant has also failed to show that if Ms. Cashwell had objected, the results of his trial would have been different.  Ms. Cashwell agrees, and the record shows, that the jury was instructed the attorneys' argument was not evidence.  In fact, both the prosecutor and

Ms. Cashwell informed the jury on multiple occasions that their arguments and interpretations of the video were not evidence; the jurors were invited to watch and listen to the recording and come to their own conclusions about the contents of the in-car video. Defendant's assertion that the jurors were improperly influenced by the prosecutor's interpretation is purely speculative. There has been no evidence submitted that shows the jurors disregarded the instructions given to them regarding the attorneys' arguments and considered the State's interpretation as evidence in this case. As such, Defendant has failed to demonstrate he was prejudiced and he is not entitled to relief as to this claim.

(ECF No. 9-6 at 202–04) (footnotes citing to trial transcript omitted).

Wilson appealed the circuit court's decision to the First DCA. The First DCA issued the following opinion:

This is an appeal from the denial of a motion for postconviction relief following an evidentiary hearing. We affirm the trial court's ruling in all respects and write only to address Appellant's claim that defense counsel was ineffective for failing to object when the prosecutor commented on a partially inaudible video recording during the State's closing argument.

I.

At Appellant's trial on charges of second-degree felony murder and robbery with a firearm, the State presented the following evidence. During the early morning hours of January 9, 2011, the victim was in a parking lot across from the Blue Bar in Pensacola when he was robbed by Appellant and Eddie Peterson, who were both carrying guns. During the robbery, Peterson hit the victim across the head with the gun, causing the victim to fall into his vehicle, where he grabbed his own gun from the glove compartment and shot Peterson. The victim then ran from the scene and made contact with two deputies of the Escambia County Sheriff's Office. The victim told them that he shot someone

who was trying to rob him.  One of the deputies took custody of the victim's gun.

During this same period, a third deputy was working off-duty at a Circle K across from the Blue Bar when he heard a gunshot in an adjacent parking lot.  The deputy responded to the parking lot and discovered Peterson lying on the ground with two other men— Appellant [Wilson] and Tavares Grimsley—leaning over him.  Both men were very upset.  Appellant and Grimsley were placed in the back of a patrol vehicle, where their conversation was recorded on video. The video recording was admitted into evidence, without objection, and played for the jury.

A crime scene technician responded to the scene and recovered two firearms—a revolver underneath a red SUV, and a semiautomatic under Peterson's body.  Peterson died of a gunshot wound to the chest, and a spent cartridge recovered from the scene was fired from the victim's gun.  A crime laboratory analyst with the Florida Department of Law Enforcement tested the DNA obtained from the grip of the revolver found under the red SUV and determined that it contained a "mixture of at least four individuals," one of whom was Appellant.

At the conclusion of the trial, the jury returned a verdict finding Appellant guilty as charged on both counts.  Appellant subsequently filed a motion for new trial, claiming that the State's closing argument included comments interpreting inaudible portions of the recorded conversation between Appellant and Grimsley in the back of the patrol car.  The trial court denied the motion for new trial, adjudicated Appellant guilty, and sentenced him as a prison releasee reoffender to concurrent terms of life in prison with a ten-year mandatory minimum. On direct appeal, this court affirmed Appellant's convictions and sentences without opinion.  *Wilson v. State*, 130 So. 3d 232 (Fla. 1st DCA 2014) (table).

Appellant subsequently filed a motion for postconviction relief, alleging, among other things, that defense counsel was ineffective for failing to object to the prosecutor's "oral interpretation" of the inaudible portions of the video recording of the conversation between Appellant

and Grimsley.   The trial court held an evidentiary hearing on the motion.

At the hearing, defense counsel testified that the video recording of the conversation between Appellant and Grimsley was introduced into evidence at Appellant's trial.  She acknowledged that there was a discussion between the prosecution and the defense that each side would argue what they believed was said on the video.  However, based on legal research conducted after the trial, defense counsel concluded that she should have objected when the prosecutor gave his interpretation of what was said in the video because the recording was inaudible.  As a result, she filed a motion for new trial on the ground that the prosecutor's oral interpretation of the inaudible recording was improper and affected the outcome of the trial.

After the hearing, the trial court entered an order denying Appellant's motion for postconviction relief.  Specifically, the court found that defense counsel was not ineffective for failing to object to the prosecutor's closing argument because the prosecutor was permitted to offer an interpretation of the evidence during closing argument.  The court also found that defense counsel made a strategic decision that both sides would offer their competing interpretations of the video evidence during closing arguments.  This appeal followed.

II.

On a motion for postconviction relief alleging ineffective assistance of counsel, the defendant must show that (1) counsel's performance was deficient, *i.e.*, it fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defense, *i.e.*, there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 694 (1984).  When the trial court rules on an ineffective assistance of counsel claim after an evidentiary hearing, the appellate court must defer to the trial court's findings of fact to the extent they are supported by competent substantial evidence, but reviews de novo the trial court's conclusions

as to whether counsel's performance was deficient and prejudiced the defendant. *Bruno u. State*, 807 So. 2d 55, 62 (Fla. 2001).

In this case, Appellant claims that the trial court committed reversible error in denying his claim that defense counsel was ineffective for failing to object to the State's closing argument commenting on the inaudible portions of the video recording. "Partial inaudibility or unintelligibility is not a ground for excluding a recording if the audible parts are relevant, authenticated, and otherwise properly admissible." *Commerford v. State*, 728 So. 2d 796, 798 (Fla. 4th DCA 1999). However,

> [w]here . . . a partially inaudible tape recording is appropriately played for the trier of fact, the case law is clear that neither a written nor oral interpretation of the inaudible portions of the tape recording is admissible unless such interpretation is properly authenticated by a person having personal knowledge of the contents of the tape recording or by an expert witness skilled in interpreting inaudible tape recordings.

*Wilson v. State*, 680 So. 2d 592, 594 (Fla. 3d DCA 1996).

Contrary to Appellant's assertion, this restriction applies only to a written or oral interpretation offered as evidence. As the jury was repeatedly reminded during Appellant's trial, closing arguments are not evidence. *See Jenkins v. State*, 189 So. 3d 866, 870 (Fla. 4th DCA 2015) (explaining that the statements of counsel during opening statements and closing arguments are not evidence). In fact, the court explicitly instructed the jury that the parties' arguments were not evidence. It is presumed that the jury followed this instruction. *See Koelemij v. State*, 285 So. 3d 376, 380 (Fla. 1st DCA 2019) ("Absent a finding to the contrary, juries are presumed to follow the instructions given them." (quoting *Carter v. Brown & Williamson Tobacco Corp.*, 778 So. 2d 932, 942 (Fla. 2000))).

During closing arguments, both the prosecutor and defense counsel were permitted to offer their interpretations of the evidence

admitted at trial, which included the video recording.  *See Patrick v. State*, 104 So. 3d 1046, 1065 (Fla. 2012) ("Closing arguments allow the State and defense to review the evidence and to explicate those inferences that may reasonably be drawn from the evidence."). Because there was no legal basis to object to the prosecutor's closing argument, defense counsel was not ineffective for failing to make a meritless objection.  *See King v. State*, 260 So. 3d 985, 1010 (Fla. 2018) (holding that "trial counsel cannot be deemed ineffective for failing to object to closing arguments that are proper").

Moreover, the trial court properly concluded that defense counsel made a reasonable strategic decision to allow both sides to offer their competing interpretations of the video recording.  We reject Appellant's assertion that defense counsel's decision was not reasonable because counsel testified that she should have objected to the State's closing argument.  Defense counsel's after-the-fact conclusion was based on an erroneous interpretation of the case law. As previously explained, both sides were allowed to comment on the contents of the video recording that was in evidence.  The parties' competing interpretations of this video evidence was not itself evidence.  It was up to the jury to determine what was actually said on the video based on the jury's examination of the evidence.  Thus, defense counsel's initial decision to allow both sides to offer their competing interpretations of the video recording was objectively reasonable.  *See Jones v. State*, 845 So. 2d 55, 65 (Fla. 2008) ("Reasonable strategic decisions of trial counsel should not be second-guessed by a reviewing court.").

III.

The trial court properly found that defense counsel was not ineffective for failing to object to closing arguments that were proper. Defense counsel's initial decision to allow both sides to offer their competing interpretations of the video recording during closing arguments was objectively reasonable.  Accordingly, we affirm the denial of Appellant's motion for postconviction relief.

*Wilson*, 311 So. 3d at 965–67.

The First DCA was the last state court to adjudicate the merits of Wilson's IAC claim, therefore, it is that state court's decision that this court must review under § 2254(d).

With respect to factual findings, the First DCA determined that the lower court's factual findings were supported by competent, substantial evidence. This federal court must also defer to the state court's factual findings, unless Wilson demonstrates, by clear and convincing evidence, that the state's findings are objectively unreasonable. Wilson has failed to make that showing.

Wilson contends the state court unreasonably found as fact that Attorney Cashwell made a strategic decision not to object during trial. Wilson bases this argument on the fact that Cashwell testified during the evidentiary hearing that she was not aware, until after trial, that she had a legal basis for objecting under *Wilson*.

The transcript of the evidentiary hearing shows that Attorney Cashwell testified that during trial and before closing arguments, she made a strategic agreement with the prosecutor that they would both argue their respective interpretations of the in-car recordings to the jury; but after trial, she conducted legal research and determined that such argument was improper:

> Q [by the State]. So I understand that you did research after the fact.
>
> A [by Attorney Cashwell]. Yes.

Q.  So we're going to take you back to that moment.  So in that moment in that trial you also wanted to be able to tell the jury what you thought the video—what you thought was said in the video, correct?

A.  No, because—

THE COURT:  Yes or no?

THE WITNESS:  No.

Q. (By Ms. Lonergan) So you didn't want to tell the jury what you thought was being said in the video, but you said it anyway in closing argument?

A.  I had no choice.

Q.   Okay.   But even in the discussion prior, you and Mr. Robinson [the prosecutor at Wilson's trial] had a discussion prior to this about how it was okay for you guys to argue to the jury about what you guys believed you heard—you believed that you guys heard two different things, right?

A.  Yes.

Q.   And so during trial—I think during a break outside of the presence of the jury, you and Mr. Robinson were arguing—or not arguing, but you and Mr. Robinson were specifically discussing this— this written interpretation versus an oral interpretation.  And ultimately you guys—I think the judge rules that you can't do it in written but you guys agree that you guys can argue to the jury about what you think the tape says, right?

A.   Because we were wrong on the law.

THE COURT:  Yes or no?

THE WITNESS:  Yes.

THE COURT:  Ms. Cashwell, please don't beat it to death.

THE WITNESS:  Okay.

THE COURT:  I mean, you made your point.  Now you just need to answer her questions.

THE WITNESS:  Yes.

THE COURT:  Okay.  Thank you.

Q. (By Ms. Lonergan) So, like I said, I understand you realized you did research after the fact, but in that moment there was a reasonable and strategic reason for both of you to argue to the jury what was said in this important piece of evidence; correct?

A.  Yes.

(ECF No. 9-11 at 168–69; *see id.* at 150–54, 156, 159).

The state court record supports the state court's factual finding that Attorney Cashwell made a strategic decision to agree that she and the prosecutor could orally argue their interpretations of the recording to the jury during closing arguments. Therefore, this court defers to that finding.

The remaining question is whether any fairminded jurist could agree with the First DCA's conclusion that Attorney Cashwell's initial, strategic decision to allow both sides to offer their competing interpretations of the video recording was objectively reasonable.  Wilson argues it was not, because Attorney Cashwell had a meritorious basis for objecting under *Wilson*.

Although an IAC claim is a federal constitutional claim which the court considers in light of the clearly established law of *Strickland*, when "the validity of the claim that [counsel] failed to assert is clearly a question of state law, . . . we must defer to the state's construction of its own law."  *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984);[6] *Callahan v. Campbell*, 427 F.3d 897, 932 (11th Cir. 2005) (holding that defense counsel cannot be deemed ineffective for failing to make a state-law-based objection when the state court has already concluded that the objection would have been overruled under state law; to conclude otherwise would require the federal habeas court to make a determination that the state court misinterpreted state law, which would violate the fundamental principle that federal habeas courts should not second-guess state courts on matters of state law); *Herring v. Sec'y Dep't of Corr.*, 397 F.3d 1338, 1354–55 (11th Cir. 2005) (denying federal habeas relief on ineffective assistance claim based on counsel's failure to make state law-based objection; holding that the Florida Supreme Court's conclusion that the proposed objection would have been overruled was binding and precluded federal habeas relief on the ineffective assistance claim:  "The Florida Supreme Court already has told us how the issues would have been resolved under Florida state law

---

[6] *Alvord* was superseded by statute on other grounds as noted in *Hargrove v. Solomon*, 227 F. App'x 806 (11th Cir. 2007).

had [petitioner's counsel] done what [petitioner] argues he should have done . . . .  It is a 'fundamental principle that state courts are the final arbiters of state law, and federal habeas courts should not second-guess them on such matters.'") (alterations in original) (quoting *Agan v. Vaughn*, 119 F.3d 1538, 1549 (11th Cir. 1997)).

Here, the First DCA already answered the question of whether Attorney Cashwell had a meritorious basis for objecting to the prosecutor's comments—she did not.  Further, based upon the Supreme Court law set forth *supra* governing prosecutorial misconduct during closing argument, defense counsel had no meritorious basis for making a federal-law based objection.  As the First DCA stated, counsel cannot be deemed ineffective for failing to make a non-meritorious objection.  *See Bolender v. Singletary*, 16 F.3d 1547, 1573 (11th Cir. 1994).

Wilson has not demonstrated that the First DCA's adjudication of his IAC sub-claim was based upon an unreasonable determination of the facts, nor has he established that the state court's decision contrary to or an unreasonable application of *Strickland*.  Wilson is not entitled to federal habeas relief on the IAC sub-claim asserted in Ground 1.

**B.** **"Ground 2:  Defense counsel rendered ineffective assistance of counsel by failing to request the independent act jury instruction."**

Wilson asserts that the trial evidence was undisputed that Cornell Stallworth shot Eddie Peterson (ECF No. 5 at 15).  Wilson claims defense counsel should have

requested the "independent act" jury instruction (*id.*).  Wilson states he presented

this IAC claim in his amended Rule 3.850 motion (*id.*).  He asserts defense counsel

testified at the post-conviction evidence hearing that the reason she did not request

the instruction was because she "didn't think about it at the time," but counsel

acknowledged that the jury instruction may have helped Wilson (*id.*).  Wilson

contends counsel's failure to request the jury instruction constituted ineffective

assistance of counsel (*id.*).  He contends the state court's rejection of his IAC claim

was contrary to and an unreasonable application of *Strickland*, and based on an

unreasonable determination of the facts (*id.*).

The State concedes that "it appears" Wilson exhausted this claim in the state

courts by presenting it in his amended Rule 3.850 motion (*see* ECF No. 9 at 9).  The

State contends the state court's adjudication of the claim was not based upon an

unreasonable determination of the facts, nor was it contrary to or an unreasonable

application of clearly established federal law (*id.* at 27–30).

### 1.    Clearly Established Federal Law

The *Strickland* standard governs this claim.

### 2.    Federal Review of State Court Decision

Wilson presented this IAC claim as Ground 3 of his amended Rule 3.850

motion (ECF No. 9-11 at 74).   The state circuit court adjudicated the claim as

follows:

> Defendant alleges that counsel was ineffective for failing to request an independent [act] jury instruction.   This claim was scheduled for evidentiary hearing.   Ms. Cashwell testified at the hearing that there was no strategy in failing to request the instruction; she just did not think about it at the time.   Ms. Cashwell further testified that she believed if the instruction had been given it would have highlighted the difference "between the two actors" and possibly have helped Defendant.

> Defendant's allegation is without merit.

> The independent act doctrine arises when one cofelon, who previously participated in a common plan, does not participate in acts committed by his cofelon, which fall outside of, and are foreign to, the common design of the original collaboration.   An independent act instruction is appropriate only when the actions of the cofelon who allegedly acted outside the scope of the original plan were not foreseeable based on the actions a defendant set in motion.

> Kitt v. State, 260 So. 3d 462, 463 (Fla. lst DCA 2018) (citations omitted, punctuation omitted).

> In the present case, the State's theory was that Defendant, Mr. Grimsley, and the decedent formed a plan to rob Cornell Stallworth and during the course of the robbery, the decedent was shot and killed by Mr. Stallworth.   The defense's theory was that there was never a plan to rob Mr. Stallworth and Defendant was not involved in the incident that led to the shooting of the decedent.   In other words, Defendant's testimony was not that he did not participate in the common plan, but that there was no common plan.   Counsel cannot be

deficient for failing, to request an inapplicable jury instruction. Defendant is not entitled to relief as to this claim.

(ECF No. 9-11 at 207–08) (footnote citing trial transcript omitted).  The First DCA affirmed this decision without comment.

The question of whether defense counsel had a valid basis for requesting an independent act jury instruction is clearly a question of state law; therefore, this federal court must defer to the state's determination that defense counsel had no valid basis for requesting the instruction.  *See Callahan*, 427 F.3d at 932 (holding that when the state courts have already answered the question of how an issue would have been resolved under that state's law had defense counsel done what the petitioner argues he should have done, "federal habeas courts should not second-guess them on such matters" because "it is a fundamental principle that state courts are the final arbiters of state law.").  Further, considering that Wilson adamantly denied there was any common plan to rob Mr. Stallworth, the state court's determination was correct.  *See Phillips v. State*, 874 So. 2d 705, 707 (Fla. 1st DCA 2004) (holding the trial court correctly denied a self-defense instruction where the defendant refused to acknowledge that he even wielded a knife).

Wilson has not demonstrated that the state court's adjudication of Ground 2 was contrary to or an unreasonable application of *Strickland*, or that it was based

upon an unreasonable determination of the facts in light of the evidence presented.

Wilson thus is not entitled to federal habeas relief on Ground 2.

C.    **"Ground 3:  The finding that Petitioner Wilson is a prison releasee reoffender violates *Alleyne v. United States*, 570 U.S. 99 (2013), and the Sixth Amendment right to a trial by jury contained in the Constitution."**

Wilson asserts the sentencing court sentenced him as a prison releasee reoffender (PRR) to minimum mandatory life sentences based on the fact that the offenses were committed within three years of his release from prison, pursuant to Florida Statutes § 775.082(9)(a) (ECF No. 5 at 16–18).  Wilson contends the factual determination of whether the offense was committed within three years of his release from prison was not submitted to the jury and found beyond a reasonable doubt as required by the Sixth Amendment and *Alleyne v. United States*, 570 U.S. 99 (2013) (*id.*).  Wilson states he presented this claim to the First DCA on direct appeal (*id.*). He contends the state courts' rejection of the claim is contrary to an unreasonable application of the Sixth Amendment, and based on an unreasonable determination of the facts (*id.* at 18).

The State contends that although Wilson presented Ground 3 on direct appeal, the claim is unexhausted and procedurally defaulted, because Wilson failed to object to the trial court's PRR finding at sentencing and waived the issue on appeal by explicitly acknowledging at sentencing that he qualified for the PRR designation and

mandatory life sentences that came with it (ECF No. 9 at 10–11, 30).  The State argues that even if Ground 3 was not procedurally defaulted, it is without merit (*id.* at 30–36).

### 1.    Exhaustion

Wilson presented his constitutional challenge to his PRR sentence in his Rule 3.800(b)(2) motion (ECF No. 9-7 at 157–60).  The circuit court denied the claim on the merits (ECF No. 9-7 at 162–63).

Wilson presented his *Alleyne* claim to the First DCA as Issue 2 of initial brief on direct appeal (ECF No. 9-8 at 19–22).  The State argued that Wilson's failure to contemporaneously object at sentencing constituted a waiver of his right to contest the validity of the PRR determination (*id.* at 58–60).  The State alternatively argued that even if the claim was preserved, it was without merit (*id.* at 61–68).  The First DCA affirmed the judgment and sentence in a one-word decision, "Affirmed."

The First DCA, which was the last state court rendering judgment on the claim, did not clearly and expressly state that its adjudication of the claim rested on a state procedural bar.  Further, there is no reason to think the First DCA rejected Wilson's federal claim on grounds other than the merits.  *See Richter*, 562 U.S. at 99 ("When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the

merits in the absence of any indication or state-law procedural principles to the contrary.").[7]  The court thus rejects the State's exhaustion defense, concludes that the First DCA adjudicated the Sixth Amendment claim on the merits, and will address Wilson's argument that the state court's adjudication of the claim was contrary to or an unreasonable application of clearly established federal law, or based upon an unreasonable determination of fact.

### a.    Clearly Established Federal Law

Under *Apprendi v. New Jersey*, 530 U.S. 466 (2000) and later cases, a defendant has the right to trial by jury on any fact, other than "the fact of a prior conviction," that would increase the minimum or maximum sentence; and the defendant has the right to have any such fact established on proof beyond a reasonable doubt.  *Apprendi*, 530 U.S. at 490; *Alleyne*, 570 U.S. at 116; *United States v. Booker*, 543 U.S. 220, 231 (2005); *Blakely v. Washington*, 542 U.S. 296, 303–05 (2004).

---

[7] Florida courts have reviewed alleged *Alleyne* errors even where the defendant did not contemporaneously object at sentencing and presented the issue for the first time in a Rule 3.800 motion.  *See, e.g., Hollingsworth v. State*, 293 So. 2d 1049, 1051–54 (Fla. 4th DCA 2020); *Toye v. State*, 311 So. 3d 78, 81–82 (Fla. 2d DCA 2019); *Cartagena v. State*, 237 So. 3d 417, 419 (Fla. 4th DCA 2018) (noting that defendant preserved *Alleyne* claim by filing a Rule 3.800(b)(2) motion); *Robinson v. State*, 215 So. 3d 1262, 1265, 1273–76 (Fla. 1st DCA 2017) (reviewing *Alleyne* claim where defendant first raised the issue in a Rule 3.800(a) motion); *Allen v. State*, 172 So. 3d 523, 524 (Fla. 4th DCA 2015) ("[I]t is well-settled that a defendant may raise unpreserved sentencing errors under a rule 3.800(b)(2) motion.").

### b.    Federal Review of State Court Decision

Florida Statutes define a PRR as any defendant who commits an enumerated offense, including murder and robbery, within three years after being released from a correctional facility following incarceration for a felony. Fla. Stat. § 775.082(9)(a).1. The statute provides that if the prosecutor proves by a preponderance of the evidence that the defendant is a PRR, the court must sentence the defendant to a term of life imprisonment if, as in Wilson's case, the felony of which the defendant was convicted is punishable by life. Fla. Stat. § 775.082(9)(a)3.a.

At Wilson's sentencing, the prosecutor admitted into evidence a certified record of Wilson's "penitentiary pack" from the Florida Department of Corrections (FDOC), which indicated the date he was most recently released from prison (*see* ECF No. 9-2 at 12–13, 21–23). The prosecutor also admitted certified copies of judgments and sentences documenting Wilson's prior state convictions in Case No. 2004-CF-1492, Case No. 2006-CF-3228, and 2006-CF-3395 (*id.* at 11–12, 21–23). The prosecutor also admitted into evidence a certified letter from the Florida Office of Executive Clemency, stating that Wilson had not received a pardon for any of the crimes of which he was convicted (*id.* at 13, 21–23). Defense counsel did not object to the admission of any of these exhibits (*id.* at 11–13).

The prosecutor presented testimony from Tom Lewis, a latent fingerprint examiner (ECF No. 9-2 at 13–20). Mr. Lewis testified he compared Wilson's fingerprints from his arrest records in the present case with the fingerprint records from the FDOC's penitentiary pack and the judgments and sentences (*id.*). Mr. Lewis testified that he determined that all of the fingerprints were from one and the same individual, Ortavious Devon Wilson (*id.*).

The sentencing court asked defense counsel if she wished to make any legal argument as to whether Wilson qualified as a PRR (ECF No. 9-2 at 24). Defense counsel conceded that Wilson qualified under the PRR statute (*id.*). Defense counsel also stated she discussed the issue with Wilson, and he understood that the court had no choice but to sentence him to life in prison on both counts (second degree felony murder and robbery with a firearm) (*id.* at 24–25). The sentencing court determined that Wilson qualified as a PRR and imposed the mandatory sentence of life in prison on both counts (ECF No. 9-4 at 25–26).

As previously noted, Wilson presented his constitutional challenge to his PRR sentence in his Rule 3.800(b)(2) motion (ECF No. 9-7 at 157–60). The circuit court adjudicated the claim as follows:

> Defendant alleges he was convicted of second degree murder and robbery and was sentenced to a mandatory minimum life sentence based on the trial court finding him to be a prison releasee reoffender (PRR). Citing *Alleyne v. United States*, 133 S. Ct. 2151 (2013), he

claims his sentence is illegal because the PRR finding must be made by a jury beyond a reasonable doubt and not by the trial court. In *Alleyne*, the Supreme Court found facts that increase the mandatory minimum sentence must be submitted to the jury. *Id.* at 2158. The court recognized an exception for the fact of a prior conviction. *Id.* at 2160 n.l (citing *Almendarez-Torres v. United States*, 523 U.S. 224, 118 S. Ct. 1219, 140 L. Ed. 2d 350 (1998)). The *Alleyne* decision extends the rationale of *Apprendi*, which does not require the fact of a prior conviction be submitted to a jury. *See Apprendi v. New Jersey*, 530 U.S. 465,490, 120 S. Ct. 2348, 2362–2363 (2000) ("Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.")

However, Defendant asserts the finding of a prior conviction also requires a factual determination the instant offense was committed within three years of the defendant's release from prison, *See* § 775.082(9)(a)1, Fla. Stat. Citing *U.S. v. Lopez*, 500 F.3d 840, 848 (9th Cir. 2007), he argues the timing of a previous conviction is a necessary element of a sentencing enhancement and therefore, the State is required to prove Defendant's prison release date to the jury. This argument is without merit. Florida courts have held *Apprendi* does not apply to PRR sentencing or to the finding of a prior release date. *See McDowell v. State*, 789 So. 2d 956, 957–958 (Fla. 2001); *Calloway v, State*, 914 So. 2d 12, 14–15 (Fla. 2d DCA 2005); *Peterson v. State*, 911 So. 2d 184, 185 (Fla. 1st DCA 2005).

(ECF No. 9-7 at 162–63).

Wilson presented his *Alleyne* claim to the First DCA as Issue 2 of his initial brief on direct appeal (ECF No. 9-8 at 19–22). As previously noted, the First DCA affirmed the judgment and sentence without stating the reasons underlying its decision.

The First DCA reasonably rejected Wilson's claim to the extent he argued he had the right to have the fact of his prior felony convictions found by a jury. *Apprendi* clearly creates an exception for "the fact of a prior conviction."  530 U.S. at 490; *see also Almendarez-Torres v. United States*, 523 U.S. 224, 226–37 (1998) (holding that prior convictions are not an "element" that must be found by a jury); *see also, e.g.*, *Mendelson v. Fla. Dep't of Corr.*, No. 19-10130-J, 2019 WL 3206630, at *2 (11th Cir. May 30, 2019) (unpublished but cited as persuasive authority) (denying a certificate of appealability on Florida prisoner's claim that his sentencing as a PRR violated his constitutional rights under *Apprendi* because the fact that he previously had been convicted of a felony was not found by a jury; the claim was foreclosed by *Almendarez-Torres*, *supra*).

The remaining question is whether the First DCA reasonably applied clearly established federal law in rejecting Wilson's argument that he was entitled to have the jury decide that he was released from prison within three years of his current offenses.  This District Court addressed an identical claim in *Myles v. Sec'y, Dep't of Corr.*, No. 4:17cv326/RH/GRJ, 2019 WL 968880 (N.D. Fla. Feb. 28, 2019).  The District Judge in *Myles*, summarized the three relevant issues on habeas review:

> [F]irst, whether the *Apprendi* exception for "the fact of a prior conviction" extends to the date of the current offense of conviction and the date of the defendant's release from custody on the prior conviction; second, if the answer is no, whether the answer is so clear that all

reasonable jurists would agree, thus allowing relief under the
Antiterrorism and Effective Death Penalty Act's deferential standard of
review; and third, in any event, whether any error, even if beyond fair
debate, made no difference, thus precluding relief.

*Myles*, 2019 WL 968880, at *1. Applying this analysis to Wilson's claim, he is not
entitled to habeas relief.

The District Court recognized in *Myles*, that Florida's PRR statute requires a
determination of "both the date of the new offense of conviction and the date on
which the defendant was released from custody on a prior conviction." *Id.* at *2.
The court in *Myles* found it "unlikely" that either issue comes within *Apprendi*'s
narrow prior-conviction exception, because that exception, by its plain terms, applies
only to "the fact of a prior conviction." *Myles*, 2019 WL 968880, at *1–2 (quoting
*Apprendi*, 530 U.S. at 490). That, however, does not end the analysis.

To overcome § 2254(d)(1)'s deferential standard, a state prisoner must show
that "no fairminded jurist" could agree with the state court's rejection of his claim.
The District Court concluded in *Myles* that it is "fairly debatable" whether the date
of release from the prior conviction comes within *Apprendi*'s prior-conviction
exception, and that such fair debate precludes habeas relief under § 2254(d). *Myles*,
2019 WL 968880, at *3 (expressing doubt that the release date comes within
*Apprendi*'s prior-conviction exception, but recognizing that Florida state courts have
interpreted *Apprendi*'s exception to include the date of release from the prior

conviction).  The undersigned agrees that this fair debate precludes habeas relief on Wilson's claim that he was entitled to a jury determination of the **date he was released from his prior conviction**.[8]  *See, e.g., Davis v. Ayala*, 576 U.S. 257, 269–70 (2015) ("[A] state-court decision is not unreasonable if fairminded jurists could disagree on its correctness.") (internal quotation marks and citations omitted).

The court in *Myles* reached the opposite conclusion concerning whether it is "fairly debatable" that the **date of the new offense(s) of conviction** falls within *Apprendi*'s prior-conviction exception.  *Myles*, 2019 WL 968880, at *3 (emphasis added).  The District Judge concluded:

> A defendant has the right to a jury trial on proof beyond a reasonable doubt on a relevant date of an offense of conviction—a date that affects the minimum or maximum sentence under the prison-releasee-reoffender statute.  Holding otherwise may be contrary to, or involve an unreasonable application of, clearly established federal law as determined by the Supreme Court in *Apprendi* and later cases.

---

[8] It also bears noting that *Apprendi* might not have been violated anyway, even if the prior-conviction exception did not apply.  At the sentencing hearing, Wilson did not object to the admission of the FDOC "penitentiary pack" which established his release date from his most recent prison sentence.  Wilson also did not offer any argument or evidence to impeach or otherwise cast any doubt upon the accuracy or reliability of the fingerprint evidence, which matched the fingerprints of his arrest records in this case to the fingerprints of the "penitentiary pack."  If this was not an admission of the release date, it surely was close.  *See Booker*, 543 U.S. at 244 ("[W]e reaffirm our holding in *Apprendi*:  Any fact (other than a prior conviction) which is necessary to support a sentence exceeding the maximum authorized by the facts established by a plea of guilty or a jury verdict must be **admitted by the defendant** or proved to a jury beyond a reasonable doubt.") (emphasis added).

*Id.* at *3. That said, the District Court found that Mr. Myles still was not entitled to habeas relief, because there was no *Apprendi* violation in his case. Mr. Myles' charging document charged him with committing the offense on or about a specific date, and the jury verdict necessarily determined that he committed the offense on or reasonably near that date. *Myles*, 2019 WL 968880, at *3. "When a fact at issue is determined by a jury on proof beyond a reasonable doubt, there is no *Apprendi* violation." *Myles*, 2019 WL 968880, at *3.

The same is true here. Even assuming that Wilson satisfies § 2254(d)(1)'s standard concerning his claim that he was entitled to have a jury determine the date of his new offense of conviction, he is not entitled to habeas relief, because his claim fails on de novo review. Wilson was charged with a robbery and second degree felony murder that occurred on or about January 9, 2011 (ECF No. 9-1 at 63–64). Wilson testified that the events underlying the charges occurred on that date (ECF No. 9-6 at 103–17). The jury verdict necessarily determined that Wilson committed the offenses on January 9, 2011. There was no *Apprendi* violation.

Finally, even if this court found error under *Apprendi*, Wilson cannot meet the *Brecht* standard for relief on the alleged error. *See Brecht v. Abrahamson*, 507 U.S. 619, 623 (1993) (holding that the appropriate standard for harmlessness of a nonstructural constitutional error on collateral review is whether the error "had

substantial and injurious effect or influence" in determining the outcome.). The record establishes without dispute that Wilson committed the instant offenses on January 9, 2011. At Wilson's sentencing, the prosecutor submitted the "penitentiary pack" from the FDOC, with no objection from defense counsel, establishing that Wilson was released from custody on his prior conviction on April 2, 2009 (*see* ECF No. 9-2 at 18). Whether tried to a judge or jury, and whether on a preponderance or a reasonable-doubt standard, the result would be the same. Thus, it is clear beyond any reasonable doubt that any *Apprendi* error made no difference.

For all of the foregoing reasons, Wilson is not entitled to habeas relief on Ground 3. *See, e.g., Barge v. Sec'y Dep't of Corr.*, No. 3:20cv405/LAC/EMT, 2021 WL 1379524, at *19–21 (N.D. Fla. Feb. 4, 2021), *adopted,* 2021 WL 1378765 (N.D. Fla. Apr. 12, 2021); *Williams v. Inch*, No. 3:18cv638/LAC/MJF, 2020 WL 6121486, at *9–11 (N.D. Fla. Sept. 10, 2020), *adopted,* 2020 WL 6120460, at *1 (N.D. Fla. Oct. 16, 2020); *Chapman v. Sec'y, Fla. Dep't of Corr.*, No. 1:17cv179/TKW/GRJ, 2020 WL 6747390, at *9–10 (N.D. Fla. Aug. 4, 2020), *adopted* 2020 WL 6746619, at *1 (N.D. Fla. Nov. 17, 2020).

## D.    "Ground 4:  "New evidence amounting to 'actual innocence.'"

Wilson presents a "freestanding claim of actual innocence" based upon the post-conviction affidavit and evidentiary hearing testimony of Ms. Lashay Fountain

(ECF No. 5 at 18–22).  Wilson acknowledges that in *Cunningham v. Dist. Att'y Office for Escambia Cnty.*, 592 F.3d 1237, 1272 (11th Cir. 2010), the Eleventh Circuit stated that "this Court's own precedent does not allow habeas relief on a freestanding innocence claim in non-capital cases." (citing *Jordan v. Sec'y, Dep't of Corr.*, 485 F.3d 1351, 1356 (11th Cir. 2007)) (*see* ECF No. 5 at 21; ECF No. 17 at 5).  Wilson states he is presenting his freestanding actual innocence claim to "preserve[] this claim for subsequent review" (*id.*).

The State contends Ground 4 is not cognizable in federal habeas proceedings and is therefore subject to dismissal (ECF No. 9 at 12–13, 36).

The function of federal habeas corpus is to redress constitutional errors, not to relitigate state criminal cases.  *See Herrera v. Collins*, 506 U.S. 390, 401 (1993). Consequently, "[c]laims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying state criminal proceeding." *Id.* at 400; *see also Cunningham*, 592 F.3d at 1272; *Jordan*, 485 F.3d at 1356 (explaining, after declining to consider freestanding claim of actual innocence because it did not fall within certificate of appealability order, "our precedent forbids granting habeas relief based upon a claim of actual innocence, anyway, at least in non capital cases"); *Brownlee v. Haley*, 306 F.3d 1043, 1065 (11th Cir. 2002) (citing

*Herrera*) ("It is not our role to make an independent determination of a petitioner's guilt or innocence based on evidence that has emerged since the trial.).

Wilson admits he is asserting a "freestanding" actual innocence claim, i.e., a claim that is  not tied to any an independent constitutional violation occurring in the underlying state criminal proceeding.  As Wilson correctly acknowledges, this claim is not cognizable in federal habeas under existing Eleventh Circuit precedent. Wilson is thus not entitled to relief on Ground 4.

### E.    "Ground 5:  "The cumulative effect of the errors in this case deprived Petitioner Wilson of a fair trial."

Wilson contends all of the errors in his case, considered either individually or together, resulted in his being denied a fair trial (ECF No. 5 at 22).

The State contends Wilson did not demonstrate any individual errors in Grounds 1 through 4; therefore, there is no error to accumulate (ECF No. 9 at 40).

The "cumulative effect" or "cumulative error" doctrine provides that the aggregation of non-reversible errors "can yield a denial of the constitutional right to a fair trial, which calls for reversal." *Insignares v. Sec'y, Fla. Dep't of Corr.*, 755 F.3d 1273, 1284 (11th Cir. 2014) (citing *Morris v. Sec'y, Dep't of Corr.*, 677 F.3d 1117, 1132 (11th Cir. 2012)).  The federal court must first address the validity of each of the petitioner's claims individually and then examine any errors in the aggregate and in light of the trial as a whole.  *Id.*  "[T]here is generally no basis for

finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt." *United States v. Cronic*, 466 U.S. 648, 659 n.26 (1984). Where there is no actual error, the cumulative-error claim has no merit. *Insignares*, 755 F.3d at 1284 (citing *Morris*, 677 F.3d at 1132).

For the reasons discussed *supra* in Grounds 1 through 4, this court has found no actual error with respect to any of the claims subject to federal habeas review (i.e., those that are cognizable). In the absence of any actual error, Wilson's "cumulative effect" claim asserted in Ground 5 has no merit and should thus be denied.

## IV.    CERTIFICATE OF APPEALABILITY

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)." 28 U.S.C. § 2254 Rule 11(a). A timely notice of appeal must still be filed, even if the court issues a certificate of appealability. 28 U.S.C. § 2254 Rule 11(b).

"Section 2253(c) permits the issuance of a COA only where a petitioner has made a 'substantial showing of the denial of a constitutional right.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (quoting § 2253(c)(2)).  "At the COA stage, the only question is whether the applicant has shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'"  *Buck v. Davis*, 137 S. Ct. 759, 773 (2017) (citing *Miller-El*, 537 U.S. at 327).   The petitioner here cannot make that showing.   Therefore, the undersigned recommends that the district court deny a certificate of appealability in its final order.

The second sentence of  Rule 11(a) provides:  "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue."  Thus, if there is an objection to this recommendation by either party, that party may bring this argument to the attention of the district judge in the objections permitted to this report and recommendation.

Accordingly, it is respectfully **RECOMMENDED**:

1.    That the amended petition for writ of habeas corpus (ECF No. 5) be **DENIED**.

2.    That a certificate of appealability be **DENIED**.

Case No.:  3:20cv5848/LAC/EMT

At Pensacola, Florida, this 7<u>th</u> day of July 2021.


/s/ *Elizabeth M. Timothy*
_____
**ELIZABETH M. TIMOTHY**
**CHIEF UNITED STATES MAGISTRATE JUDGE**


## <u>NOTICE TO THE PARTIES</u>

**Objections to these proposed findings and recommendations must be filed within fourteen days of the date of the Report and Recommendation. <u>Any different deadline that may appear on the electronic docket is for the court's internal use only and does not control</u>. An objecting party must serve a copy of the objections on all other parties. A party who fails to object to the magistrate judge's findings or recommendations contained in a report and recommendation waives the right to challenge on appeal the district court's order based on unobjected-to factual and legal conclusions. *See* 11th Cir. Rule 3-1; 28 U.S.C. § 636.**